Manuel A. DeCARVALHO

v.

Manuel L. daSILVA.

No. 77–332–Appeal.

Supreme Court of Rhode Island.

May 21, 1980.

Arcaro, Belilove & Kolodney, Abraham Belilove, Providence, for plaintiff.

Edwards & Angell, Knight Edwards, Joseph V. Cavanagh, Jr., Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This is an action wherein the plaintiff seeks compensatory and punitive damages for defamation of character arising out of four allegedly libelous publications. The case was tried in the Superior Court before a jury over a period commencing February 17, 1977, and ending on March 3, 1977. At the conclusion of the evidence, the plaintiff made a motion for a directed verdict on the issue of liability. The defendant also made a motion for a directed verdict. The trial justice reserved decision on said motions and submitted the case to the jury, which returned a verdict for the defendant. After verdict the trial justice denied both motions for direction. Subsequently, the plaintiff filed a motion for new trial which was denied by the trial justice. The plaintiff appeals from the denial of his motion for direction of verdict and the denial of his motion for new trial; he also asserts as error numerous evidentiary rulings and instructions given by the trial justice to the jury. The facts of the case from which the controversy arose are as follows.

The plaintiff is a member of the bar of this state, of the United States District Court for Rhode Island, and of the United States Supreme Court. He specializes in immigration practice and has been an attorney in good standing since 1960. Prior to his becoming a member of the Rhode Island bar, plaintiff, who is a native of Portugal, was appointed by the Government of Portugal as its Consul for the State of Rhode Island. He served in this capacity from 1950 until shortly after his admission to the bar in 1960. Thereafter, in 1966, he was appointed Honorary Portuguese Consul for the State of Rhode Island. In this capacity plaintiff signed visas for visitors to the Azores and 300 or 400 passports per year for Portuguese nationals who were resident in the Rhode Island area. He appeared at dinners from time to time and participated in functions of interest to the Portuguese-American community. He made addresses three to five times a year, served on community committees, and helped to entertain visiting Portuguese dignitaries. Evidence indicated that the Portuguese-American community in Rhode Island numbered between 70,000 and 100,000 people. In 1969 plaintiff, together with two other individuals, Joao Tomaz and Joao Pacheco, agreed to assist certain Portuguese workers who were natives of the Island of Sao Miguel in the Azores to emigrate to the United States, where plaintiff had arranged for employment with a Rhode Island firm that was desirous of obtaining a number of Portuguese employees. Apparently each employee recruited from the Azores would pay $250. In return for this sum, plaintiff and his two associates arranged for the necessary documents relating to emigration from Portugal and immigration into the United States. Such assistance in emigration was forbidden by a Portuguese statute, referred to in evidence as Article 25 of Portuguese Public Law 36.558, enacted October 28, 1947. This statute forbade the "engagement" of emigrants, an activity that might be defined as performing services as a go-between in order to assist in the emigration of a Portuguese national.

A Portuguese trial court at Ribeira Grande, Azores, found plaintiff and his associates guilty of the violation of this statute and imposed a fine of 90,000 escudos

upon each "transgressor." The plaintiff was required to pay his fine because of his presumed knowledge of the law, since he had exercised the function of Portuguese Consul. The other two "transgressors" had their fines suspended since the court specifically found that their offenses arose out of their confidence in plaintiff and were committed in the belief that they were acting legally. This offense did not involve moral turpitude but reflected, rather, the policy of the Portuguese government that no "go-between" was necessary in order to assist a Portuguese emigrant. All responsibility for such work had been placed by the government in the Department of Immigration, which the court stated to be wholly responsible for all processes and formalities prior to the emigration of any Portuguese national and the necessary documentation incident thereto. The decision of the court of first instance was upheld by two appellate courts, including the Supreme Court of Portugal.

The defendant, a doctor of medicine, had been active in Portuguese-American affairs for many years. He was a frequent volunteer and active worker in matters relating to the Portuguese-American community. The defendant became aware of plaintiff's "transgression" and shortly thereafter expressed his opinion with acerbic vigor in four publications. Two of the publications were printed in a Portuguese periodical entitled *A Chama* on July 8, 1971, and January 13, 1972. Two statements were broadcast over station WADK in Newport, Rhode Island, on January 16, 1972, and January 23, 1972. All four publications were in the Portuguese language. Translations of these publications were introduced into evidence in the course of the trial. In these publications the conduct of plaintiff was characterized as a "scandal upon scandal." The plaintiff was referred to as a "wolf in sheep's clothing" and as one who shames all Portuguese-Americans and the prestige of the glorious name of Portugal in the United States. Although the publications were substantially correct in describing the nature of the offense of which plaintiff was convicted, they contained a number of inaccuracies and exaggerations. For example, some of the publications stated that plaintiff had been suspended as honorary consul. This was not true. The publications contained statements that plaintiff and his associates had been previously fined as "engagers of emigrants," when in fact there had only been one fine and one conviction. It was suggested in the publications that plaintiff and his associates had charged the emigrants $1,000 each, while in fact only $350 had been charged by plaintiff's Portuguese associates and only $250 had been requested by plaintiff as necessary for documentation. The $100 in excess was returned to each individual. The Portuguese court found specifically that "they were not overcharged." The court further found that although twenty persons were to migrate from Sao Miguel, only eighteen received contracts and only fifteen took advantage of the opportunity; the remaining three decided to go to Canada. The publications suggested that nineteen emigrants were involved but that the initial plan was for sixty emigrants. The trial justice found as a fact in his decision on motion for new trial that a representative of a firm named Natco had requested plaintiff to arrange to bring in eighteen to twenty Portuguese nationals to work in the New England area, even though the Portuguese court had made reference to a plan to contract for a total of "some 60 Portuguese workers."

Generally plaintiff contends that the four publications exaggerated the incident out of all proportion to its real importance. The plaintiff asserts that the transgression of which he was convicted did not involve moral turpitude, that it was not scandalous, and that it represented only a minor violation of Portuguese law. He further asserts that this exaggeration, coupled with inaccuracies and certain statements of fact which were wrong, constituted defamation of character which in the classic sense brought plaintiff into public ridicule, hatred, and contempt.

Initially, it was the task of the trial justice in this case to determine the substantive and adjectival rules that were applicable to allegedly libelous publications. For

approximately two centuries the doctrine of libel and slander was "almost exclusively the business of state courts and legislatures." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 369–70, 94 S.Ct. 2997, 3022, 41 L.Ed.2d 789, 822 (1974) (White, J., dissenting). In his dissenting opinion, Mr. Justice White faithfully sets forth the general rules concerning libel and slander as they prevailed in the vast majority of jurisdictions:

> "Under typical state defamation law, the defamed private citizen had to prove only a false publication that would subject him to hatred, contempt, or ridicule. Given such publication, general damage to reputation was presumed, while punitive damages required proof of additional facts. The law governing the defamation of private citizens remained untouched by the First Amendment because until relatively recently, the consistent view of the Court was that libelous words constitute a class of speech wholly unprotected by the First Amendment subject only to limited exceptions carved out since 1964." *Id.* at 370, 94 S.Ct. at 3022, 41 L.Ed.2d at 822–23 (White, J., dissenting).

The general rule described by Justice White was consonant with the law of Rhode Island. *See Bray v. Providence Journal Co.*, 101 R.I. 111, 220 A.2d 531 (1966); *Laudati v. Stea*, 44 R.I. 303, 117 A. 422 (1922). Generally, the intent of a defendant was immaterial and care or lack of care was not relevant save in mitigation of damages. *Folwell v. Providence Journal Co.*, 19 R.I. 551, 37 A. .6 (1896). The prevailing rule was that truth was a complete defense to liability in any action for defamation. Restatement *Torts* § 582 (1938). Punitive damages might be awarded in the event that the plaintiff proved that the article was published with actual malice or recklessness equivalent to malice. *Folwell v. Providence Journal Co.*, 19 R.I. at 555, 37 A. at 7. Malice in the common-law sense connoted evil intent or motive arising from spite or ill will, or culpable recklessness or willful or wanton disregard of the rights and interests of the person defamed. *McDonald v. Brown*, 23 R.I. 546, 51 A. 213 (1902). Other than opposing prior restraint, the common law provided very little protection against liability for false defamatory publications or against a whole host of potential civil and criminal sanctions which might be imposed upon the publisher of materials deemed to be illegal or malicious. These general principles had been recognized in Blackstone's *Commentaries* and were not thought to be subject to constitutional inhibitions. 4 Blackstone, *Commentaries* *150–53; Levy, *Legacy of Suppression* (1960); Sutherland, *Constitutionalism in America* 118–19 (1965).[1]

---

1. Blackstone's general approach to the freedom of the press within the context of responsibility for improper publications may be summed up by the following observation:

> "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity." 4 Blackstone, *Commentaries* *151–52.

This was consonant with the definition of freedom of the press as viewed from the perspective of the common law:

> "The common law's definition of freedom of the press meant merely the absence of censorship in advance of publication. But the presence of punishment afterwards, for 'bad sentiments,' oral or published, had an effect similar to a law authorizing previous restraints. * * * The common-law definition of freedom of the press left the press at the mercy of the crown's prosecutors and judges. Freedom of discussion and the law of libel were simply incompatible; the first could not coexist with the second." Levy, *Legacy of Suppression* 14–15 (1960).

The foregoing common law principles undoubtedly formed the context within which the Framers of the First Amendment viewed the freedom of the press which they sought to insulate from diminution by the new Federal Congress. This concept is illustrated by the historical evaluation given by Dean Levy in attempting to recreate a late eighteenth century perspective:

> "We may even have to confront the possibility that the intentions of the Framers were not the most libertarian and their insights on the subject of freedom of expression not the most edifying. But this should be expected since the Framers were nurtured on the

Upon this coherent and inwardly consistent body of principles, the Supreme Court of the United States introduced an innovative and unprecedented constitutional gloss in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in implementation of the First Amendment ban upon abridgement of freedom of the press. In that case in response to a substantial award of damages by an Alabama court for an advertisement published by the *New York Times* which was found to be related to a commissioner of public affairs of the city of Montgomery, the Supreme Court issued new substantive and procedural rules in libel actions brought by public officials. Although the advertisement contained exaggerations and inaccuracies which through the exercise of reasonable care could have been found to exist by the publisher, the Court determined that "constitutional guarantees require * * * a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." [2] *Id.* at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706.

The same year the constitutional inhibition upon state law set forth in the *New York Times* case was extended to criminal libel actions in which at common law the criticism of public officials could be punished, even when the statements were true, if published for malicious motives. *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Three years later the *New York Times* principles were extended to actions brought by public figures as well as those brought by public officials. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In the foregoing case, a football coach, though privately employed, and a retired major general (both of whom had been allegedly defamed by untrue statements of fact) were made subject to the "actual malice" rule.

Having cut deeply into the traditional law of libel and slander, the Supreme Court soon found that the creation of a new set of coherent and symmetrical rules was more than a casual endeavor. By a series of cases the Court refined the *New York Times* concept. *Garrison v. Louisiana, supra* ; *Henry v. Collins*, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965) (per curiam); *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 88

crabbed historicism of Coke and the narrow conservatism of Blackstone. The ways of thought of a lifetime are not easily broken. The Declaration of Independence severed the political connection with England but the American states continued the English common-law system. If the Revolution produced any radical libertarians on the meaning of freedom of speech and press, they were not present at the Constitutional Convention or the First Congress which drafted the Bill of Rights. But to understand that scholars and judges have betrayed a penchant for what Professor John P. Roche calls 'retrospective symmetry,' by giving to present convictions a patriotic lineage and tradition—in this case, the fatherhood of the 'Framers'—is no reason to be distressed. We may miss the comforting assurance of having the past's original intentions coincide with present preferences. Yet the case for civil liberties is so powerfully grounded in political philosophy's wisest principles, as well as the wisest policies

drawn from experience, that it need not be anchored to the past." *Id.* at 3–4.

**2.** It should be noted that the "actual malice" defined by the Supreme Court is not the common law spite or ill will as previously adverted to in this opinion, but constitutes a wholly different standard. Publication with bad or corrupt motive, spite, ill will, or general hostility does not satisfy the *New York Times* standard, and the "actual malice" therein defined can never be inferred from the mere presence of such factors. *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 281, 94 S.Ct. 2770, 2780, 41 L.Ed.2d 745, 760 (1974); *Greenbelt Cooperative Publishing Assn. v. Bresler*, 398 U.S. 6, 10, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6, 13 (1970); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248, 250 (1967); *Rosenblatt v. Baer*, 383 U.S. 75, 84, 86 S.Ct. 669, 675, 15 L.Ed.2d 597, 604 (1966); *Garrison v. Louisiana*, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125, 132 (1964).

S.Ct. 197, 19 L.Ed.2d 248 (1967) (per curiam); *Curtis Publishing Co. v. Butts, supra*; *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Greenbelt Cooperative Publishing Assn. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

In *Rosenbloom v. Metromedia, Inc., supra,* a plurality of the Court extended the *New York Times* privilege to include defamatory falsehoods relating to private persons if the statements concerned matters of general or public interest. Mr. Justice Brennan, speaking for the plurality, sought to eliminate the distinction between public officials and public figures on the one hand and private individuals on the other. He focused attention on the societal interest in learning about certain issues. *Id.* at 43, 91 S.Ct. at 1819, 29 L.Ed.2d at 311–12. Two members of the Court concurred in the result in *Rosenbloom* but departed from the reasoning of the plurality. Justice Black restated his view, long held, that the First Amendment gave news media an absolute and indefeasible immunity from liability for defamation. Justice White concurred on the narrow ground that the "First Amendment gives the press and the broadcast media a privilege to report and comment upon the official actions of public servants in full detail, with no requirement that the reputation or the privacy of an individual involved in or affected by the official action be spared from public view." *Id.* at 62, 91 S.Ct. at 1829, 29 L.Ed.2d at 322.

Later in *Gertz v. Robert Welch, Inc., supra,* a majority of the Court, in an opinion written by Mr. Justice Powell, retreated from that extension of the *New York Times* doctrine. The Court reaffirmed the applicability of the *New York Times* privilege to publishers and broadcasters of a defamatory falsehood concerning public officials and public figures. However, it felt that private individuals were more vulnerable to injury, and therefore the state interest in protecting them was correspondingly greater. 418 U.S. at 344, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. Consequently, the Court held that states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual, as long as they do not impose liability without fault. The Court further limited private individuals to compensation for actual damages incurred where the ordinary negligence standard would be applicable. The Court issued the caveat that in order to obtain an award for punitive damages, a plaintiff would be required to meet the *New York Times* standard by proving by clear and convincing evidence actual knowledge of the falsehood or reckless disregard of whether the material was false or not. *Id.* at 350, 94 S.Ct. at 3012, 41 L.Ed.2d at 811. The Court had previously held in *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968), "that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

Thus, it appears that the present state of the law, as enunciated by the Supreme Court of the United States, imposes upon states two major bodies of restrictions in respect to allowing recovery for defamatory publications. First, in regard to public officials and public figures, no recovery may be permitted unless the plaintiff proves by clear and convincing evidence that the publication was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not. Second, in regard to private citizens, the states may apply their own laws in respect to the publishing of defamatory material, except that liability may not be established without fault (a concept that indicates that at least ordinary

negligence must be shown). The further exception to the second rule is that recovery must be limited on the ordinary negligence standard to actual damages incurred. In the event that exemplary damages are to be awarded, then the "actual malice" element must be shown by clear and convincing evidence. Let us attempt to apply these rules to the case at bar.

■ Initially, plaintiff asserts that the *New York Times* standard is inapplicable here because defendant is concededly not a professional member of the news media. He quotes language from various cases which might arguably lead to the conclusion that only media defendants are entitled to the privilege. This contention raises many types of equal protection problems. Defining professional members of the media would be a difficult task indeed. This would require drawing distinctions between free-lance writers and the occasional author of a book, article, or pamphlet on the one hand and regularly employed agents of a great metropolitan daily newspaper or broadcasting syndicate on the other. As far as we are aware, the freedom of the press enshrined in the First Amendment was designed to apply to the lonely pamphleteer as well as to the (then unknown) syndicated columnist. In any event, the short answer to this contention is that the Supreme Court of the United States has clearly applied the *New York Times* standard to nonmedia defendants in *St. Amant v. Thompson, supra* (a candidate for public office) and in *Garrison v. Louisiana, supra* (a district attorney). Thus the trial justice was correct in drawing no distinction between defendant in this case and so-called "media defendants."

■ The second major contention of plaintiff is that he was not a public figure. In accordance with the rule enunciated in *Rosenblatt v. Baer, supra*, the trial justice determined that plaintiff was a public figure. In that case the Court observed that "as is the case with questions of privilege

generally it is for the trial judge in the first instance to determine whether the proofs show [plaintiff] to be a 'public official.'" 383 U.S. at 88, 86 S.Ct. at 677, 15 L.Ed.2d at 606. The Court further stated in a footnote that allowing the judge to make such a decision will lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular attorneys and publishers and will further ensure that an appellate court will have the record it requires for a review of constitutional decisions. *Id.* at 88 n. 15, 86 S.Ct. at 677 n. 15, 15 L.Ed.2d at 606–07 n. 15. The standard of review of the trial justice's decision is not so clearly defined. However, the Court in *New York Times Co. v. Sullivan, supra*, would seem to require this court to make an independent examination of the whole record in order to determine the correctness of the trial justice's decision. 376 U.S. at 285, 84 S.Ct. at 728–29, 11 L.Ed.2d at 709. Following this course, we have examined the facts of the case in the light of the definition of public figure set forth in *Gertz v. Robert Welch, Inc., supra*, and further refined in *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). The evidence indicates that plaintiff had for many years served as Portuguese Consul and Honorary Consul in the state of Rhode Island and that he had been prominent and active in Portuguese-American social and ceremonial affairs for more than twenty-five years at the time of trial. The trial justice characterized plaintiff as a "giant" in the Portuguese community. Since the publications at issue were broadcast in the Portuguese language and were aimed at a community of Portuguese-Americans, we believe it appropriate to determine whether he was a "pervasive public figure" as suggested in *Gertz v. Robert Welch, Inc., supra*, within the context of that community. We believe that the trial justice, according to these standards, was correct in finding as a preliminary fact that plaintiff was a "pervasive public figure" in the Portuguese community of approximately 100,000 persons.[3]

**3.** The plaintiff cites *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411

(1979), in which a research scientist was found not to be a public figure. He also cites *Wol-*

**814**

Having found that plaintiff was a public figure within the Portuguese community, the trial justice then instructed the jury in accordance with the federal constitutional standards as described by the United States Supreme Court that it was plaintiff's burden to prove by clear and convincing evidence that the defamatory material was published with knowledge that such defamatory statement was false or with reckless disregard of whether it was false or not. He also instructed the jury that "the test for actual malice is a subjective one which requires you to determine the defendant's state of mind at the time that he published the articles and made the broadcasts in question." We believe that these instructions are in accordance with the principles enunciated in *New York Times Co. v. Sullivan, supra,* where the Court required that the defendant in fact must have entertained serious doubts as to the truth of his publication. Considering the difficulties of the concepts involved, we believe that the trial justice's instructions on the substantive law, as well as the burden of proof, were clear, understandable, and precise.

■ The plaintiff also asserts that a number of evidentiary rulings were erroneous and prejudicial to his ability to prove his case before the jury. We have examined these evidentiary rulings in the context of the applicable constitutional standards. Most of them related to attempts by plaintiff to show that the violation of the Portuguese statute was of a less serious nature than indicated by defendant in his publications. Putting aside the hearsay nature of certain of the answers sought by a number of these questions, we observe that all of the rulings were essentially based on relevance. We believe that in all instances, the determination of the trial justice concerning relevance was well within the bounds of his discretion. *Gaglione v. Cardi,* R.I., 388 A.2d 361, 363 (1978). The plaintiff has failed to sustain the burden of estab-

lishing that the proposed evidence was material and that its exclusion had a prejudicial influence upon the ultimate decision of the court. *Atlantic Paint & Coatings, Inc. v. Conti,* R.I., 381 A.2d 1034, 1036 (1977); *Mercurio v. Fascitelli,* 116 R.I. 237, 244, 354 A.2d 736, 740 (1976).

■ The further contention of plaintiff is that the trial justice erred in declining to direct a verdict in favor of plaintiff on the issue of liability, even in the light of federal standards. In considering plaintiff's motion for directed verdict, the trial justice was required, without weighing the evidence or considering the credibility of witnesses, to view the evidence and inferences reasonably deducible therefrom in the light most favorable to defendant and to submit the case to the jury if, upon so viewing the evidence, it appeared that there were material issues upon which reasonable persons might differ. *Johnson v. Palange,* R.I., 406 A.2d 360, 364 (1979); *Nagy v. McBurney,* R.I., 392 A.2d 365, 367 (1978); *Evans v. Liguori,* R.I., 374 A.2d 774, 776 (1977); *Marshall v. Tomaselli,* R.I., 372 A.2d 1280, 1283 (1977). In short, it was incumbent upon the trial justice in considering this motion to determine whether reasonable minds could differ in respect to the issues of publication by defendant of known falsehoods or publication of the inaccuracies in question with reckless disregard of whether they were false or not. In view of these standards, the trial justice was clearly correct in denying plaintiff's motion for a directed verdict, and plaintiff's contentions to the contrary are utterly without merit.

■ The final contention of the plaintiff is that the trial justice erred in denying the plaintiff's motion for a new trial. In the case at bar, the trial justice reviewed the evidence in the case at considerable length. He showed complete familiarity with his obligation to make an independent review of the evidence in the light of his

ston v. Reader's Digest Association, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), wherein a person falsely accused of espionage was also not a public figure. These factual findings, which were made by a court on mo-

tion for summary judgment, even in the light of the Court's standard of review are not controlling or even applicable in the resolution of the facts in issue in the instant case.

instructions in accordance with the standards laid down by this court in *Lemieux v. American Universal Insurance Co.*, 116 R.I. 685, 699–700, 360 A.2d 540, 547 (1976), *Gordon v. Campanella Corp.*, 112 R.I. 417, 311 A.2d 844 (1973), and *Barbato v. Epstein*, 97 R.I. 191, 196 A.2d 836 (1964). He specifically found that the defendant believed what he said to be true and that there was an absence of evidence of actual malice in the constitutional sense. Evaluating his decision in the light of these standards, we find that the plaintiff has failed to persuade this court that the findings on which the trial justice relied in deciding the motion were clearly wrong or that he overlooked or misconceived evidence on a controlling issue in the case. The evidence clearly supported the trial justice's finding that there had been no reckless disregard of the truth. The evidence further established that the defendant entertained no serious doubts about the truth of his assertions. At bottom, the gravamen of the plaintiff's complaint is that the defendant exaggerated the seriousness of the offense. Although the trial justice substantially agreed that the defendant's language was harsh and that the offense was of minor significance, these factors would not deprive the defendant of the shield furnished by the "actual malice" test. Generally under the First Amendment, expression of opinion is absolutely protected. "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 339–40, 94 S.Ct. at 3007, 41 L.Ed.2d at 805; see *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).

For the reasons stated, the appeal of the plaintiff is denied and dismissed, the judgment appealed from is affirmed, and the case is remitted to the Superior Court.

DORIS and MURRAY, JJ., did not participate.