Carole J. JOHNSON

v.

Clifford W. JOHNSON, Jr.

No. 92–576–Appeal.

Supreme Court of Rhode Island.

Feb. 23, 1995.

J. Ronald Fishbein, Providence, for plaintiff.

Joseph Keough, Keough & Gearon, Pawtucket, for defendant.

## OPINION

WEISBERGER, Acting Chief Justice.

This case comes before us on appeal by the defendant, Clifford W. Johnson, Jr. (defendant) from a judgment entered in the Superior Court in favor of his former wife, Carole J. Johnson (plaintiff) awarding her compensatory damages of $5,000 plus interest and punitive damages in the amount of $20,000 for allegedly slandering the plaintiff in a public place on the evening of August 29, 1986. We affirm the judgment in part and reverse in part. The facts of the case as stated succinctly in the plaintiff's brief are as follows.

On the evening of August 29, 1986, plaintiff entered Twin Oaks Restaurant in Cranston and proceeded to walk to the podium. While at the podium, plaintiff saw defendant approach and ask her how her "[epithet] lawyer Fishbein" was. The defendant then drew nearer plaintiff who was standing with her then boyfriend—now husband Philip Caliri. At a distance of about four feet, in a loud voice, defendant screamed, "Phil, you are a * * * [epithet]. You could have prevented this case." The defendant then pointed his finger in the face of plaintiff, while talking to Philip Caliri but screaming for all to hear, "You and that [obscenity] whore are costing me a lot of money." These defamatory remarks were made in the presence of between fifty and seventy-five people in the foyer of the restaurant. After the remarks were made, the noise level changed from loud to very quiet.

■ The sole issue that has been preserved on appeal is the denial of defendant's motion for a new trial. Although defendant raises a number of constitutional issues relating to the First Amendment to the Constitution of the United States, these issues were not raised below and consequently cannot be considered for the first time on appeal. *Ferland Corp. v. Bouchard,* 626 A.2d 210 (R.I. 1993); *Bouchard v. Clark,* 581 A.2d 715 (R.I.

1990). It should be noted that defendant did not object to the instructions given by the trial justice and therefore those instructions are not before us for review. The question presented to us is whether the evidence in this case supports a determination by the trial justice to deny a motion for new trial in respect both to compensatory and punitive damages.

In considering this question, it is helpful to note the specific findings of fact made by the trial justice in his review of the evidence and in the exercise of his independent judgment. The transcript discloses the following factual recitation:

"Now, in this case, the charge made against the [d]efendant was that he had slandered Mrs. Johnson. There is no question, based upon the facts here, that Mrs. Johnson was a lady of somewhat dubious habits. The record is rather clear and indicates she had married the [d]efendant, Clifford W. Johnson, some time in February, I believe, of 1964, and that marriage lasted until July 16, 1968. Of that marriage, there was one child who, for purposes of this record, should remain unnamed. Now, at the time of her divorce from the [d]efendant, Clifford W. Johnson, in July of 1968, Mrs. Johnson was pregnant with a child and that child was not the progeny of Clifford Johnson, but was instead the progeny of his first cousin, Richard. And, as fate would have it, a month after her divorce in July of 1968, she married Richard Johnson. She married him on August 13, 1968. And after that marriage to Richard Johnson she unfortunately did not settle down but continued to have extramarital tendencies and those tendencies [led] her to an involvement both social and sexual, including several pregnancies that were aborted, with a Ronald Malafonte, properly named; Malafonte means bad child. That took place in 1980, as I recall the evidence. Apparently having tried Ronald Malafonte and apparently having tired of Ronald Malafonte, and apparently after Richard Johnson became suspicious and divorced her, she then decided that she would take up again with the [d]efendant, Clifford Johnson. As they say in polite circles, there's no fool like an old fool, and Clifford came running. He resumed a non-common law relationship with Carol[e] Johnson that lasted until she fell out of love with him and in love with a fellow by the name of Philip Caliri who, I believe, was a Sergeant on the Cranston Police Department at the time and who later graduated and was promoted to be the maitre'd at Twin Oaks Restaurant, but whatever it be, while she was seeing Mr. Caliri, and I assume while he was whispering sweet nothings into her viable ear, she decided perhaps she could get something from the first Johnson, Clifford, and she then claimed in a lawsuit in Family Court that there was a common law marriage that had come about as a result of her amorous relationship with Mr. Johnson, this is Johnson No. 1. That relationship, that common law relationship was alleged to have taken place because Johnson No. 1 put her up into an apartment or into a house, and she was living there and he was visiting there, and I assume they got to be great chess and checker players. Be that as it may, her petition in the Family Court alleging a common law marriage came on to be heard in 1984 before Mr. Justice Gallogly, and he found that there was no common law marriage. After that decision, there was an appeal taken by Mrs. Johnson to the Rhode Island Supreme Court. In December of 1985, as I recall the facts, the Supreme Court remanded the matter to the Family Court for specific findings, and when the matter was remanded to the Family Court, I believe Judge Gallogly had retired, and so it fell upon the broad shoulders of Judge Goldberg. Judge Goldberg heard the [m]atter in late January, if my memory serves, of 1987, and he found again there was no common law marriage. Mrs. Johnson, dissatisfied with that decision, appealed the matter to [the] Supreme Court, and on December 17, 1987, the Supreme Court upheld Judge Goldberg's finding of the non-common law marriage and that ended the litigation; the amorous relationship between Johnson 1 and Mrs. Johnson.

"Prior to the Supreme Court's final determination of the common law relation-

ship, but while the litigation was all still ongoing, Mrs. Johnson went to the Twin Oaks Restaurant in Cranston where her new-found love was the maitre['d], and on the night of August 29, 1986, Johnson No. 1 unfortunately happened to be in the restaurant and from the evidence we were told that he went there frequently. I was very much interested in what his relationship was with the maitre['d], but I assume he always got a good table. Anyway, on the night of August 29, 1986, Mr. Johnson, after I assume having a few liquid refreshments, decided to go to the [m]en[s'] [r]oom, and on the way back, in the presence of the usual crowd, there was estimated in the testimony to be 50 to 75 people, Mr. Johnson walked by Mrs. Johnson and her new-found love and he uttered the words we've been discussing for the past few moments. Without repeating them, he displayed his affection for Mr. Fishbein and he also displayed his affection in descriptive terms for his former wife and his would-be common law wife, because the common law matter was still going on at that time. Without going into it, he referred to his wife as a whore.

* * * * * *

"There's no question in the [c]ourt's mind, as suggested by Mr. Keough, that she was not of virtuous character and that she perhaps fit all of those descriptions of a whore that was given to the jury. But nonetheless, be she a whore or not, she's entitled to the protections of the law, and the law is clear and the law is that while truth is a defense, if it is uttered maliciously, it is then actionable, and that's what happened here. So that when I'm reminded of my definition of what a whore is, those definitions are all from decided cases and they all fit the [p]laintiff, there's no question about it; but so does the constitutional prohibition and the protection that she has, and that is that one cannot be slandered maliciously."

Without question the trial justice in his determination regarding the law of slander and libel bore in mind the provisions of article 1, section 20, of the Rhode Island Constitution as well as the provisions of G.L.1956 (1985 Reenactment) § 9–6–9 which provides:

"In every action or proceeding, civil or criminal, for libel or slander, the defendant may, with his plea of not guilty or his answer, file a written notice that he will prove the truth of the publication charged as libelous, or of the words charged as slanderous, and in such case may, upon the trial, give the truth in evidence, without any special plea of justification or affirmative defense in his answer; and *the truth, unless published or uttered from malicious motives, shall be sufficient defense to the person charged."* (Emphasis added).

Although we are of the opinion that defendant has not preserved the federal constitutional issues that are mentioned in his brief, it is appropriate to set forth the legal framework underlying actions for defamation as that framework has been construed over a period of time by this court and by the Supreme Court of the United States. In *DeCarvalho v. daSilva,* 414 A.2d 806 (R.I. 1980) we considered in a libel action the developments that had taken place by way of federal constitutional limitations since the landmark case of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its extensive progeny. We summarized the state of law as it existed in 1980 in the following excerpt:

"Thus, it appears that the present state of the law, as enunciated by the Supreme Court of the United States, imposes upon states two major bodies of restrictions in respect to allowing recovery for defamatory publications. First, in regard to public officials and public figures, no recovery may be permitted unless the plaintiff proves by clear and convincing evidence that the publication was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not. Second, in regard to private citizens, the states may apply their own laws in respect to the publishing of defamatory material, except that liability may not be established without fault (a concept that indicates that at least ordinary negligence must be shown). The further exception to the second rule is that recovery must be limited on the ordinary negligence standard to actual damages in-

curred. In the event that exemplary damages are to be awarded, then the 'actual malice' element must be shown by clear and convincing evidence." *DeCarvalho,* 414 A.2d at 812–13 (these latter restrictions had been imposed by *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

That summary though accurate at the time has been further modified and explicated by a more recent case, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). In that case, in an opinion written by Justice Powell and joined by Justices Rehnquist and O'Connor, the plurality expressed the doctrine that in defamation cases wherein the defamatory statements do not involve matters of public concern, the First Amendment to the United States Constitution does not require a showing of "actual malice" for either compensatory or punitive damages and that the award of such damages may be made in accordance with state law. This plurality opinion was buttressed by concurring opinions issued by Chief Justice Burger and Justice White. These Justices concurred that *Gertz* did not apply to actions for defamation arising out of statements or publications that were of no public concern. There seems little question that the evidence in this case clearly establishes that the defamatory statements made by defendant were not matters of public concern.[1]

The term "whore" has been defined in Black's Law Dictionary 1597 (6th ed.1990) as: "A woman who practices illicit sexual intercourse, either for hire or to gratify a depraved passion. A woman given to promiscuous intercourse. A woman who practices unlawful commerce with men, particularly one who does so for hire; a harlot; a concubine; a prostitute."

The trial justice cited similar definitions from Webster's Dictionary in his instructions to the jury.

 Factually, this is indeed a close and difficult case. The findings of fact made by the trial justice are clear and unequivocal that the plaintiff fit the definition of the defamatory term applied to her. Thus the only question to be decided was whether the statement was uttered maliciously. This does not mean First Amendment constitutional "actual malice" but refers to common-law malice "arising from spite or ill will, or culpable recklessness or willful or wanton disregard of the rights and interests of the person defamed." *DeCarvalho,* 414 A.2d at 810; *McDonald v. Brown,* 23 R.I. 546, 51 A. 213 (1902). The findings of fact of the trial justice would lead us to the inevitable conclusion that this defendant had been sorely provoked and misused by plaintiff in the course of her marital and extramarital relationship with him as well as her unsuccessful litigation in the Family Court to establish a common-law marriage. When defendant uttered the defamatory statement, he was certainly angry. We cannot say that the trial justice was clearly wrong when he confirmed the probable finding of the jury (although no special interrogatories had been submitted) that defendant acted out of spite and ill will. In this case some spite and ill will might be understandable. Nevertheless, the finding of the trial justice on this issue may not be disturbed since he did not misconceive or

---

1. The constitutional and statutory provisions in force in Rhode Island are similar to the Louisiana Criminal Defamation Statute considered in *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Under the Louisiana statute, a district attorney was convicted of criminal defamation by issuing a statement disparaging the judicial conduct of eight criminal district court judges of Orleans Parish. The Louisiana statute provided for criminal sanctions even for true statements made with "actual malice" in the common law sense of spite or ill will. Mr. Justice Brennan pointed out that at common law, truth was no defense to criminal libel. *Id.* at 67–68, 85 S.Ct. at 212, 13 L.Ed.2d at 129. The Court held pursuant to the principles of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that the Louisiana statute incorporated constitutionally invalid standards in the context of criticism of the official conduct of public officials. In sum, the Court held that the *New York Times* rule absolutely prohibits punishment of truthful criticism of public officials and, therefore, it was constitutionally impermissible to direct punishment for true statements made as a result of "hatred, ill will or enmity or a wanton desire to injure * * * ." *Garrison,* 379 U.S. at 78, 85 S.Ct. at 217, 13 L.Ed.2d at 134–35. The opinion in *Garrison* is not applicable to the case at bar because we are not dealing with public officials, public figures, or even matters of public concern.

overlook material evidence nor was he otherwise clearly wrong. *Marcotte v. Harrison,* 443 A.2d 1225 (R.I.1982); *Fox v. Allstate Insurance Co.,* 425 A.2d 903 (R.I.1981).

However, on the issue of punitive damages, we have a somewhat different question to resolve. Punitive damages, though allowed in defamation cases, *Bosler v. Sugarman,* 440 A.2d 129 (R.I.1982), are severely restricted under Rhode Island law as recently enunciated in *Palmisano v. Toth,* 624 A.2d 314 (R.I.1993). In that case we stated that the party seeking punitive damages has the burden of producing " 'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.' " *Id.* at 318 (quoting *Sherman v. McDermott,* 114 R.I. 107, 109, 329 A.2d 195, 196 (1974)). We went on to observe:

"The standard in Rhode Island for imposing punitive damages is rigorous and will be satisfied only in instances wherein a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages. * * * An award of punitive damages is considered an extraordinary sanction and is disfavored in the law, but it will be permitted if awarded with great caution and within narrow limits." 624 A.2d at 318.

The case at bar is somewhat unique in respect to defamation cases, since there is a finding by the trial justice that the statement is essentially truthful. We are then confronted with the question concerning whether a truthful statement, but one issued with a supportable finding of spite or ill will under enormous provocation may meet the rigorous standard which we set for punitive damages. We believe that it does not.

In the case at bar, we are constrained to hold that the trial justice was clearly wrong in upholding the award of punitive damages. To a great extent defendant was the victim of a long course of reprehensible behavior committed against him by plaintiff. Unfortunately, his unrestrained vituperation would, under Rhode Island law, support a judgment for compensatory damages. The defamatory statement made under extreme provocation does not meet the rigorous standard set forth in *Palmisano,* 624 A.2d at 318. Even a finding of spite and ill will in the circumstances of this case cannot warrant punishment in the form of a $20,000 punitive damage award being imposed upon a defendant who was probably more a victim over a longer period of time than was plaintiff. We note that had the parties and behaviors been reversed, wherein the former wife under similar circumstances called her former husband a "male whore," our holding would be the same.

Ordinarily, when this court sustains an appeal from the denial of a motion for new trial, it remands the case to the Superior Court with direction that a new trial be afforded to the appealing party. In this case, however, we hold that the award of punitive damages is sufficiently unconscionable that a new trial would be an exercise in futility. The plaintiff's evidence in this case was virtually uncontradicted, although she herself admitted that she lied on the witness stand. No evidence that might be adduced in the course of a new trial could warrant the sustaining of a punitive damage award.

For the reasons stated, we sustain the defendant's appeal in part in respect to the award of punitive damages and remand the case to the Superior Court with directions to enter judgment for the plaintiff for compensatory damages only together with interest and costs and to expunge the award of punitive damages.