Roland A. FOURNIER et al.

v.

Paul J. FOURNIER et al.

No. 81–580—Appeal.

Supreme Court of Rhode Island.

June 25, 1984.

James M. Sloan III/Michael J. Murray, Providence, for plaintiffs.

Joseph E. Marran, Jr., Pawtucket, for defendants.

## OPINION

WEISBERGER, Justice.

Three brothers, all shareholders of the same corporation, brought this stockholders' action against the corporation and its majority stockholder, a fourth brother. The defendants appeal from a Superior Court judgment granting plaintiffs' petition to reinstate the assistant manager of E.P. Fournier Co., Inc., (E.P. Fournier Co.) following his employment termination by the president and manager of the company. The plaintiffs cross-appeal from that portion of the judgment which denies their petition for cancellation of stock certificates issued to the president and manager allegedly by fraud and in violation of a fiduciary duty. We affirm the judgment in both aspects.

The court is faced with what essentially amounts to a family dispute cloaked in corporate structure. Before us are four brothers and E.P. Fournier Co., a family-established business founded by their father, Ernest P. Fournier, and incorporated in 1953 under the general incorporation statutes of Rhode Island. The principal source of contention lies in the apparent breakdown of the combined business and fraternal relationships of two of the brothers, namely Paul J. Fournier and Roland A. Fournier. At the time of the events leading to this suit, Paul and Roland were members of a two-person board of directors. In addition, Roland served as vice president and secretary, and Paul served as president and treasurer. Pursuant to employment agreements, Roland was the assistant manager and Paul was the general manager. Additionally, Paul was the majority stockholder, owning 251 shares, and Roland owned 204 shares. Two other brothers, Bertrand and Alfred, each own-

ing 15 shares, support Roland in this action against Paul and the corporation.[1]

E.P. Fournier Co. was and remains to this day a closely held corporation primarily engaged in the sale and servicing of new and used automobiles. Its original articles of association drawn in 1953 authorized 600 shares of no-par common stock, of which 501 were issued—426 shares to Ernest P. Fournier and 15 shares to each of his five sons.[2] Until his death in January 1965, Ernest P. Fournier operated and controlled the business. For several years prior to Ernest's death, Paul and Roland were the only sons actively engaged in the business with their father. Subsequent to their father's death, the company was operated by the two brothers in apparent harmony.

However, the relationship between them began to erode during the summer of 1980 to the extent that on or about October 6, 1980, Paul, then president and manager, unilaterally terminated Roland's employment. Testimony was presented at the trial that just prior to Roland's dismissal, the two brothers had argued about their respective sons who were also employed by the corporation. Evidence stipulated to also showed that in late September 1980, Paul prepared an agreement and advised Roland that if he refused to sign it, Roland's benefits and services with the company would be terminated. Provisions of the agreement stated among other things that Paul owned a majority of the issued and outstanding stock of the company, that all management decisions regarding the company were Paul's exclusive authority, that Paul could invoke his absolute legal right to dismiss Roland without cause, and that Roland's son would no longer be employed by the company. Roland did not sign the agreement. Several days later, Paul informed Roland that his services at the company would no longer be required.

Paul terminated all benefits and salary Roland derived from his employment and in addition removed from Roland's garage two vehicles used by him but owned by the corporation.

Crucial to this controversy is an agreement entered into on December 31, 1962, by Ernest P. Fournier, Roland, and Paul. Several weeks prior to the agreement, Paul, after having worked for about two years as manager of the corporation, expressed his dissatisfaction with company operations, terminated his employment, and "walked out," whereupon his father sought him out and negotiated his return. The episode spurred the December 1962 agreement, of which two provisions are pertinent to this appeal:

"(a.) That Paul and Roland each shall have the right to purchase from Ernest one-half (½) of his total stock holdings in E.P. Fournier Co., Inc., now totalling four hundred twenty-six (426) shares as hereinafter set forth, at an agreed price of Sixty ($60.00) Dollars per share in minimum monthly purchases of one share each, with no limitation, however, on the maximum purchase they may make hereunder.

"* * *

"(d.) That Ernest hereby recognizes that Paul shall act as general manager of the Corporation with full authority to hire, approve sales and contribute to policy decisions affecting the interest of the Corporation."

Thereafter, Paul resumed as general manager of E.P. Fournier Co., and Roland undertook the smaller, used-car phase of the business. In accordance with provision (a) of the 1962 agreement, both Paul and Roland exercised the option to purchase Ernest's shares by having $60 deducted from their earnings each month for the purchase of one share. By the time of

---

**1.** Another brother, Ernest O. Fournier, now deceased, initially owned 15 shares. Pauline Fournier, his widow, held his fifteen shares at *the time* of this action.

**2.** Some question exists whether the amount of outstanding stock was 500 or 501. The parties have not made this discrepancy an issue. Therefore, we shall assume that the correct number is 501.

Ernest's death, both brothers each had purchased thirty-three shares, bringing their total ownership to forty-eight shares each.

On appeal, plaintiffs claim that Paul's acquisition of Ernest's shares, making him majority stockholder, was accomplished by fraud and in violation of his fiduciary duty as executor of their father's estate. The defendant also appeals and challenges the trial judge's holding that because Roland was under an employment agreement as assistant manager with the board of directors, Paul lacked the power to terminate him unilaterally without authorization of the board of directors. Having provided the background for this dispute, we shall address each claim, supplying additional facts as they may be necessary for our discussion.

## I

■■■ We hold that the authority to remove Roland from his position as assistant manager of the E.P. Fournier Co., as well as from the offices of vice president and secretary, lies with the board of directors and not with Paul pursuant to any of his individual, corporate capacities. The power of removal is often explicitly conferred by a corporation's own law in its charter or bylaws, or by statute. Neither the charter of E.P. Fournier Co. nor its bylaws contain provisions in respect to the removal of officers or agents. General Laws 1956 (1969 Reenactment) § 7–1.1–45 of the Rhode Island Business Corporation Act states:

> "Removal of officers.—Any officer or agent may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights."

However, we find that § 7–1.1–45 does not by its language grant exclusive power of removal in the board of directors. For that reason, we do not rely completely on this section in determining where lies the authority to remove corporate officers and agents.

It is the prevailing view that the power to remove officers and agents of a corporation resides in the body that appointed or elected them. *American Center For Education, Inc. v. Cavnar*, 80 Cal.App.3d 476, 492, 145 Cal.Rptr. 736, 746–47 (1978). *See Stott v. Stott Realty Co.*, 246 Mich. 267, 270, 224 N.W. 623, 624 (1929); *Brindley v. Walker*, 221 Pa. 287, 292, 70 A. 794, 795 (1908). *See generally* 2 Fletcher, *Cyc. Corp.* § 357 (Perm rev. ed. (1982)). The authority to remove is inherent in and incident to the authority to select. They are corollary powers.

The bylaws of E.P. Fournier Co. imposed on its board of directors the duty to manage the business and affairs of the corporation. On June 1, 1960, the shareholders added a provision to the bylaws which authorized the board of directors to enter into agreements for management of the business with any individuals it deemed necessary as manager or assistant manager. Those agreements were not in evidence. Indeed, on the same day, the board entered into such contracts employing Paul as manager and Roland as assistant manager. By means of its employment contract with Roland, the board delegated to him some of the powers, duties, and liabilities imposed on it under its bylaws. Having charged Roland to act for it in the first instance, the board of directors possessed the inherent right and authority to remove from him such aspects of managerial authority as it had bestowed on him. This we find is consistent with general principles of agency which give a principal the right to revoke the agency. *See* 1 Restatement (Second) *Agency* § 118 at 300 (1958).

Paul asserts that his employment agreement with the board of directors making him manager of the corporation in 1960 effectively conferred on him all of the board's authority to manage the corporation, including its power to remove Roland. In short, he asserts that by the agreement,

the board of directors stripped itself of all managerial and decision-making functions. This we find contravenes both the theory inherent in the corporate structure and our corporate statutes.

■ Section 7-1.1-33 provides that "[t]he business and affairs of a corporation shall be managed by a board of directors." Although this section grants to the board sole original power to manage the affairs of the corporation, the authority of corporate directors may be limited by other statutory provisions or by the corporation's own law through its charter or bylaws. Under the authority of the bylaws of E.P. Fournier Co., the board of directors entered into management contracts with Paul and Roland, thereby delegating in part its authority to manage the corporation. Although we recognize that in Paul's appointment as manager the board delegated the authority to carry on the day-to-day business of the corporation, we do not believe that the board completely abdicated its power, as Paul suggests. The duties and powers of a general manager, while extensive, do not result in the deprivation of all statutory authority and responsibilities of the directors.

> "[T]he general rule is that, in the absence of express restrictions on his powers, with actual or constructive notice thereof to persons dealing with him, an officer or agent of a corporation, entrusted with the general management and control of its business, has implied authority to make any contract or do any other act which is necessary or appropriate to the conduct of the *ordinary business of the corporation.*" (Emphasis added.) 2A Fletcher, *Cyc. Corp.* § 667 at 239 (Perm rev. ed. 1982)

Too broad a delegation of powers, either express or implied, may be interpreted as an unlawful abdication by the board of directors of its management functions. *See* Henn, *Law of Corporations*, § 212 at 573 (3d ed. 1983). Moreover, this aspect of Paul's argument is not supported by the facts. Subsequent to Paul's assuming the position of manager, the board-of-directors continued to function as a body. Many affairs of the corporation requiring board action and approval were conducted by the directors. There were board-of-directors meetings. The directors entered into the December 1962 agreement. Directors met to select new officers after the death of Ernest P. Fournier. We believe, therefore, that Paul's claim that he has effectively been the board of directors of E.P. Fournier Co. since 1960 has no basis in law or in fact. That being so, *a formal board meeting should have been called for the purpose of terminating Roland.* It is noteworthy in this instance that a meeting of the board of directors comprised of Paul and Roland would probably lead to deadlock on this matter. Nothing short of a stockholders' meeting could accomplish Roland's removal. These procedural obstacles, however, cannot justify Paul's unilateral action. The formalities of board-of-director or stockholder action were required.

We recognize that the unique set of circumstances presented by closely held corporations often warrants a relaxation of strict adherence to the corporate statutory scheme. In *Baker v. Smith*, 41 R.I. 17, 102 A. 721 (1918) we stated, "Formal meetings of directors are not necessary where their usual course of business is to act informally." *Id.* at 32, 102 A. at 727. Paul relies on *Baker* to persuade us that in the instant case no directors' meeting was required to terminate Roland. We distinguish *Baker* from the case before us by noting that in *Baker*, both directors met informally and conferred on the transaction of business. Thus they "accomplish[ed] the same result which would have attended a more ceremonious attitude." *Id.*, 102 A. at 727. No such contention could be made in the instant case.

The Rhode Island General Assembly has recognized the special problems relating to closely held corporations. The governing corporate statute, § 7-1.1-51, entitled "Special Provisions Relating to Close Corporations," permits close corporations to

operate essentially in the manner Paul has suggested. However, to benefit by the section, a corporation must meet its requirements. Section 7–1.1–51 reads in pertinent part:

> "(a) Provisions of the articles of incorporation or by-laws of a corporation organized under this chapter, or provisions of an agreement relating to such a corporation, which would otherwise be invalid because they (i) *restrict, or assign to one or more shareholders or other persons, any or all of the powers normally vested in the board of directors or provide that there shall be no board of directors,* * * * shall nevertheless be valid if such provisions have been approved by all the shareholders of the corporation and if the corporation's original or amended articles of incorporation contain a heading immediately after the name of the corporation stating that it is a close corporation pursuant to § 7–1.1–51. This subsection shall not be deemed to invalidate any provision in articles of incorporation, by-laws or agreements that would otherwise be valid. A provision authorized by clause (i) of this subsection may include a provision that there shall be no board of directors." (Emphasis added.)

Paul's employment agreement of 1960, by which he claims he derived all the powers of the board of directors, does not meet the requirements of this section.

Finally, we comment briefly on the December 1962 contract that expressly provided that Paul had the power to hire. The provision relating to Paul did nothing more than reinstate him as manager after he left the corporation for a brief time. His authority to hire and therefore to fire refers only to subordinates, clerks, salespersons, and others who would assist in the carrying out of ordinary business operations. We do not characterize Roland's position as coming within that category of personnel.

We agree with the decision of the trial justice that Roland's termination was ineffective and improper and that he should be reinstated to the active position of assistant manager "with the salary and all other benefits to which that position entitles him." [3]

## II

The trial justice was correct in holding that Paul neither committed fraud nor violated his fiduciary duty as executor or as majority shareholder in acquiring such portion of his father's stock as made him majority stockholder. Therefore, we affirm his denial of plaintiffs' petition for cancellation of that stock.

In support of their appeal, plaintiffs advance the following contentions: (1) under provision (a) of the December 1962 agreement, Roland and Paul could each purchase up to, but not more than, one-half of the outstanding shares owned by Ernest P. Fournier, and their stock ownership was intended to be equal; (2) Paul acquired twenty-three shares by fraud; and (3) Paul breached his fiduciary duties as executor as well as majority shareholder and director by purchasing the additional twenty-three shares. The following facts are pertinent to our discussion.

The original articles of E.P. Fournier Co. provided that before any stockholder sells or otherwise disposes of his shares in the corporation, he shall first offer them to the corporation in writing. In December 1962 the shareholders approved a waiver of E.P. Fournier Co.'s right pursuant to the articles with respect to the stock that was the subject of the December 1962 agreement. The agreement recited that Ernest P. Fournier was the owner of 426 shares of E.P. Fournier Co. stock. In actuality, on December 31, 1962, Ernest owned 255 shares, and Fournier Realty, Inc., owned 170

---

**3.** It may well be that it will be necessary for a trial justice of the Superior Court to resolve any dispute that may arise between the parties concerning the exact dollar amount to which Roland may be entitled under this judgment. We shall leave that determination to such justice in the event that the parties are unable to agree regarding this aspect of the judgment.

shares. The shares of the latter corporation were totally owned by Ernest.

On January 6, 1965, the day before he died, Ernest P. Fournier duly executed a will in which he nominated Paul J. Fournier as his executor. The second clause of the will incorporated by reference provision (a) of the December 1962 agreement that gave equally to Paul and Roland an option to purchase one-half of Ernest's stock in E.P. Fournier Co. The clause directed the executor to carry out the terms of the agreement. The third clause of the will directed the executor

"to give to my said sons, Paul J. Fournier and Roland A. Fournier, the right to purchase at any time within one (1) year from the date of my death, all or any portion of my common stock in Fournier Realty Inc. at a price to be determined by an independent appraiser selected by the attorney who shall represent the Executor of my estate, and that the proceeds from the exercise of said option shall be added to the residue of my estate."

At the time of Ernest's death, Fournier Realty, Inc., owned 146 shares of E.P. Fournier Co. stock.[4]

The administration of Ernest P. Fournier's estate was complicated both by a will contest pitting Ernest's widow and three of her sons against Roland and Paul, and also by a lack of liquidity needed to meet estate taxes and various loan obligations. Paul and Roland attempted to solve this problem through a somewhat complex stock-redemption and refinancing plan. At the core of this plan was their decision to purchase Ernest's stock pursuant to the rights conferred on them by the December 1962 agreement. On July 12, 1965, a directors' meeting was called at which two pertinent

transactions occurred. First, the 146 shares owned by Fournier Realty, Inc. were canceled and transferred to the estate of Ernest P. Fournier, bringing the total shares owned by the estate to 359. Second, 203 shares of the corporate stock were purchased by Paul (bringing his total shares to 251), and 156 shares were purchased by Roland (bringing his total shares to 204). To meet the cost of their stock purchases, both brothers executed various loan documents, mortgages, and guarantees, as well as assigning their respective interests in Ernest's estate. Roland's promised purchase price was approximately $2,800 less than the amount promised by Paul.

Rejecting plaintiffs' position that Roland and Paul should currently have equal ownership of the corporation's stock, to wit 228 shares each, the trial justice found that Paul's acquisition of an additional 23 shares was consonant with the terms of the 1962 agreement as well as those of Ernest P. Fournier's will. We summarize his findings.

The trial justice held that plaintiffs failed to establish two of the elements of fraud or deceit, namely a false representation made by defendant and justifiable reliance by plaintiff. *See East Providence Loan Co. v. Ernest*, 103 R.I. 259, 263, 236 A.2d 639, 642 (1968). The trial justice relied heavily on the testimony of the corporation's attorney, who stated that Roland had been apprised of the disproportionate-ownership plan prior to the closing on July 12, 1965. The attorney's testimony was corroborated by various documents that Roland had signed which referred to the amount of

---

**4.** During the interim between the execution of the December 1962 agreement and the death of Ernest P. Fournier in 1965, Paul and Roland each purchased 33 shares of E.P. Fournier Co. stock. Twenty-one of those shares were purchased from Ernest P. Fournier, and 12 were purchased from Fournier Realty Co. Thus, at Ernest's death, his estate owned 213 shares of the company's stock, and Fournier Realty Co. owned 146 shares.

New stock certificates for the shares purchased from Ernest P. Fournier were never issued in the names of Paul and Roland. Therefore, at his death Ernest P. Fournier was still the record owner of 255 shares. On July 12, 1965, directors of the E.P. Fournier Co. voted to correct the corporate records regarding stock ownership.

Roland's and Paul's shares as 156 and 203 respectively.

In respect to plaintiff's argument that the December 1962 agreement limited Paul and Roland to equal ownership status, the trial judge stated:

"It is not reasonable to conclude either from the wording of the Agreement or the circumstances surrounding its execution that Mr. Fournier wanted to force his sons to be equal owners even against their wishes or to penalize one son for the other's lack of interest in buying the full fifty percent to which he was entitled by prohibiting the first son from purchasing more than one-half of the stock.

"In short, the Court finds that in granting each son the right to purchase one-half of his stock, Mr. Fournier intended only to give each an equal opportunity to purchase stock and did not intend to foreclose Paul and Roland from agreeing to a disproportionate purchase."

The trial justice also found that E.P. Fournier Co.'s preemptive right to purchase its own shares was duly waived and that the waiver encompassed the aggregate number of shares owned by Ernest (255 shares) and by Fournier Realty, Inc. (170 shares), being controlled by Ernest. That being so, Paul did not usurp the corporation's opportunity to purchase the number of shares in excess of the 156 which Roland did not choose to purchase on July 12, 1965.

Finally, the trial justice ruled that Paul did not violate his fiduciary duty to other legatees as executor of his father's will. He found that the December 1962 agreement gave Paul a right to purchase the subject shares and that the will directed him as executor to honor the terms of the agreement. The evidence clearly indicates that the estate received full value for these shares purchased by Paul and Roland. There is no indication that any other persons were interested in purchasing this stock at the same or greater price. Both of these issues depend upon resolution of mixed questions of law and fact. *See De-Nardo v. Fairmount Foundries Cranston, Inc.*, 121 R.I. 440, 445–49, 399 A.2d 1229, 1232–34 (1979).

■ This court has consistently held that the findings of the trial judge will be given great weight on appeal and will not be disturbed unless it can be shown that such findings are clearly wrong or that the trial justice misconceived or overlooked relevant evidence on a crucial issue. *See Traversa v. Smith*, R.I., 437 A.2d 1358, 1360 (1981); *In re Armand*, R.I., 433 A.2d 957, 962 (1981); *Citizens for Preservation of Waterman Lake v. Davis*, R.I., 420 A.2d 53, 59 (1980); *Milliken v. Milliken*, 120 R.I. 762, 764, 390 A.2d 934, 935 (1978). In the absence of extraordinary circumstances (wherein only one conclusion is possible and thus a question of law is presented), the conclusions reached by a trial justice in mixed questions of law and fact are entitled to the same weight as are his factual findings. *See DeNardo*, 121 R.I. at 448, 399 A.2d at 1234. We have reviewed the record, and we conclude that the trial justice neither misconceived nor overlooked material evidence, nor was he otherwise clearly wrong in finding that Paul did not acquire majority stockholder status by fraud or in violation of his fiduciary duty as executor. The evidence fully supported the determination by the trial justice that none of the stock certificates standing in Paul's name warranted cancellation.

For the reasons stated, the defendants' appeal is denied and dismissed; the plaintiffs' cross-appeal is denied and dismissed, and the judgment is affirmed. The papers in the case may be remanded to the Superior Court.

SHEA, J., did not participate.