George H. MARTIN

v.

WILSON PUBLISHING CO. et al.

83–95–Appeal.

Supreme Court of Rhode Island.

Aug. 23, 1985.

"5) As a result of these injuries, Donna Vadeboncoeur died from injuries sustained."

---

John R. Mahoney (Carroll Kelly & Murphy), Providence, for plaintiff.

Joseph V. Cavanagh, Jr. (Edwards & Angell), Robert B. Gates (Gardner Sawyer Gates & Sloan), Providence, Abraham Goldstein, Warwick, for defendants.

## OPINION

**WEISBERGER, Justice.**

This is an action wherein the plaintiff, George H. Martin (Martin), seeks compensatory and punitive damages for defamation arising out of an allegedly libelous paragraph contained in an October 19, 1977 story printed in the Chariho Times by defendant Wilson Publishing Co. The case was tried in the Superior Court before a jury from August 23 through August 27, 1982. Following the presentation of the plaintiff's case and again at the conclusion of all of the evidence, the defendants by motion requested that a verdict be directed in their favor. The trial justice denied the defendants' earlier motion and reserved decision on the defendants' latter motion. The trial justice then submitted the case to the jury, which returned a verdict for the defendants. Thereafter the reserved motion for direction of verdict was denied. The plaintiff raises three issues on appeal by asserting as error instructions given by the trial justice to the jury as well as evidentiary rulings. The defendants in this case have cross-appealed and claim error in the trial justice's denial of the defendants' motion for a directed verdict.

Because we find the trial justice erred in formulating the proper issue for the jury to decide, we sustain plaintiff's appeal. The facts from which the controversy arose are as follows.

The plaintiff in this action is a successful businessman and long-time resident of Cranston. A number of years ago he formed the J. Regan Steel Erection Company, a construction company of which he continues to serve as an officer, and later he formed Martin Industries. This latter business entity was a real estate holding company created for the acquisition of properties in the village of Shannock, Rhode Island.

Shannock is best described as a small village in southern Rhode Island through which the Pawcatuck River flows. Part of Shannock lies within the border of Charlestown and the remaining portion of the village is located in Richmond.

For many years an active mill served as an important focal point in this community whose roots date back to colonial days. The mill and other properties were owned by a prominent and long-established family by the name of Clark. Up until the late 1960s when the Clarks closed the mill, there is little question that they owned or controlled most of the real property in the village of Shannock. In 1969 Martin first became acquainted with Shannock and thereafter took an interest in acquiring properties in the village. Martin's first purchase was a tract containing several structures known collectively as the Carmichael mansion. Subsequent renovations were made to this property. Martin then purchased from the Clark family twenty-two structures located in the center of Shannock. These were mill houses, which Martin also rehabilitated and made available as rental units. Martin's further purchases in Shannock included a parcel containing four homes situated on approximately 6½ acres of land (also rehabilitated and then put up for rent by Martin), the mill that had been owned by the Clark family, another small mill, and a gas station that Martin converted into a country store. By this time Martin was making numerous trips each week supervising his holdings in Shannock, which consisted of approximately 125 acres of various types of real property.

Needless to say, residents of the village took notice of Martin's ever-expanding presence in the village. In connection with his acquisitions, Martin appeared numerous times before local regulatory agencies in efforts to secure appropriate permits to proceed with various development plans that he envisioned for his Shannock properties. On October 19, 1977, the article upon which this suit is based, "The new face of Shannock village," appeared in the Chariho Times. The story first traced the history of the village, noted its settlement by one of the Clark family's ancestors in 1710, and

described the significance to the town of the large mill owned by the Clarks that had operated under the name Columbia Narrow Fabrics Co. The article then focused on Martin and on the changes that were taking place in the village as a result of his real estate acquisitions. The article gave particular attention to Martin's plans to convert the large old mill into an apartment complex with a restaurant and small shopping center. The story indicated, among other things, that town residents were apprehensive, were less than enthusiastic about Martin's plans, and doubted his good intentions. The article then stated:

"Some residents stretch available facts when they imagine Mr. Martin is connected with the 1974 rash of fires in the village (the abandoned depot, the back of the Shannock Spa, and even that old barn he loved). Local fire officials feel that certain local kids did it for kicks. The same imaginations note that the fire at the old Shannock mill before he bought it made it cheaper (but less valuable), or that the fire there since he bought it might have been profitable (though derelict buildings, such as it was, are customarily uninsurable)."

It is this particular paragraph that Martin asserts defamed him. Specifically, the sting of the libel, it is asserted, is that the newspaper essentially reported the existence in Shannock of false, defamatory rumors circulating about town connecting Martin with a rash of incendiary fires, despite the fact that the newspaper had no belief in the underlying truth of such rumors. The principal issue in this case, therefore, is whether it is permissible for a newspaper to publish false, defamatory rumors (even about a public figure) when the substance of the rumors is believed to be untrue by the newspaper.

In his charge to the jurors the trial justice, after earlier determining that plaintiff was a public figure, formulated the issue for them to decide as follows:

"In order for the plaintiff to recover, plaintiff must prove to you that the statement that there were rumors in the Village of Shannock was in fact false. In other words, the plaintiff has to prove to you that there were no such rumors in the Village of Shannock.

That means that the plaintiff has to prove a negative, he has to prove that something did not exist, and that's a difficult burden to sustain. Plaintiff in this case to recover has to show you that some residents of Shannock did not imagine that he was connected with fires, that is to say, there were no such rumors among the residents of the Village to that effect."

We shall deal with the propriety of the trial justice's instructions after first considering the correctness of his initial determination that plaintiff was a public figure.

I

## WAS PLAINTIFF A PUBLIC FIGURE?

In instructing the jury concerning the law of libel, the trial justice noted that our decision in *DeCarvalho v. DaSilva*, R.I., 414 A.2d 806, 813 (1980), reiterates the principle established by the United States Supreme Court that it is for the trial justice in the first instance to determine whether the plaintiff in an action for defamation is a public figure. This preliminary ruling, of course, is critical to the standard of proof plaintiff must bear with respect to defendant's conduct in publishing the alleged defamatory material. In the case at bar, the trial justice determined that Martin "was a public figure in the Village of Shannock and in the environs of Shannock, specifically in the area where the Chariho Times was published." The plaintiff challenges this determination on two grounds. He argues that his status as a public figure should have been determined not by looking to the 1977 population of approximately 300 individuals who resided in Shannock where the paper was circulated and who might have recognized plaintiff as a public figure but rather by looking to the entire circulation (3,000 copies) of the newspaper during this period and ascertaining whether such read-

ership would have considered plaintiff a public figure. The plaintiff points out that the Chariho Times that contained the alleged defamatory paragraph was delivered to residents in towns other than Shannock, which readers were unfamiliar with Martin. The plaintiff's other contention is that notwithstanding any group's being used as a measure to determine plaintiff's public-figure status, plaintiff's mere ownership of property in Shannock and the village residents' knowledge of him did not justify the trial justice's conclusion that plaintiff, in the circumstances of this case, was a public figure. We disagree with both of these contentions.

■ We stated in *DeCarvalho, supra,* that in accordance with the holding in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), it is for the trial judge in the first instance to determine whether the proofs show plaintiff to be a public official or public figure. We went on to state that it was the obligation of this court to make an independent examination of the whole record in order to determine the correctness of the trial justice's decision. *DeCarvalho,* R.I., 414 A.2d at 813. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686, 709 (1964). In reviewing the trial justice's decision and exercising our independent judgment, we do not sit as a court of *nisi prius,* and deference must be given to the findings of fact made by the trial justice and inferences drawn therefrom as in all determinations of questions of mixed law and fact. *Fournier v. Fournier,* R.I., 479 A.2d 708, 715 (1984); *State v. Cline,* 122 R.I. 297, 303, 405 A.2d 1192, 1196 (1979).

■ The Supreme Court of the United States has given guidance for the determination of public-figure status in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and some further refinement in *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). Neither of these cases purports to give a hard and fast definition. Consequently, the trial justice must look to the facts of each case in order to make this basic constitutional determination upon which the burden of proof will depend. In the case at bar, the trial justice found that plaintiff had attained public-figure status in the village of Shannock. Martin had also been the subject of publications in the New England Press outside the Chariho area, including the Boston Globe, the Providence Journal, and the Westerly Sun. He had also been interviewed and was included in a film concerning Shannock in 1976 by the Rhode Island Department of Community Affairs. As a consequence, the evidence in the case would clearly support the conclusion that Martin's fame had spread beyond the confines of the village of Shannock into surrounding areas. Of course, very few individuals will be known to all subscribers or purchasers of any publication. In the case in which the public-figure status was first enunciated, *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), it could scarcely have been contended that the football coach at the University of Georgia was known to all of the subscribers to the Saturday Evening Post. Even Major General Edwin Walker may not have been known to all of the subscribers to that publication. It is sufficient to attain public-figure status that plaintiff should have been known to a substantial portion of the publication's readership. In the instant case, we conclude that there was ample evidence in the record to support the trial justice's determination that plaintiff was a public figure within the area in which the Chariho Times was circulated.

## II

## IS THE REPUBLISHING OF FALSE OR BASELESS RUMORS CHARGING PLAINTIFF WITH CRIMINAL CONDUCT ACTIONABLE EVEN THOUGH DEFENDANTS WERE NOT THE AUTHORS OF THOSE RUMORS?

We now reach the heart of this controversy and determine what were the facts

necessary for plaintiff as a public figure to prove in this case in order to prevail in his action against defendants.

In *New York Times*, the doctrine was enunciated and later refined by subsequent United States Supreme Court cases (see cases collected in *DeCarvalho*, R.I. at, 414 A.2d at 811–12) to the effect that a public figure may not recover damages for a published defamatory falsehood about him "unless he proves that *the statement* was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706. (Emphasis added.) The critical inquiry in this case is what is meant by "the statement," as that term is used in the oft-repeated principle articulated in *New York Times*. This is especially so when the case involves the publication of false defamatory rumors. In respect to rumors, there is a statement by the originator of the rumor (who is generally unknown);[1] there then is repetition (further publication) of the statement by others; and finally, as in this case, there may be printed publication of either the statement itself or the fact that others are circulating the statement or even some hybrid version of both in which it is unclear whether the publisher has concurred in the statement, has completely disavowed it, or is in some way impartially trying to distance itself from those who are reported as having made the statement.

The defendants argued at trial, and the trial justice instructed the jury, that defendants would not be liable for the publication of rumors that plaintiff had been guilty of the crime of arson if, in fact, such rumors existed. In essence, the trial justice ruled as a matter of law that if such rumors were current at or before the time of publication, the newspaper could republish such rumors with impunity. Consequently, the trial justice required plaintiff,

in order to prevail, to prove that there were no such rumors. With this proposition of law we respectfully disagree.

■ It has long been recognized in respect to the law of defamation that one who republishes libelous or slanderous material is subject to liability just as if he had published it originally. *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 60–61 (2d Cir.1980); *Metcalf v. The Times Publishing Co.*, 20 R.I. 674, 678, 40 A. 864, 865 (1898); *Folwell v. Providence Journal Co.*, 19 R.I. 551, 553–54, 37 A. 6, 6 (1896); *Rice v. Cottrel*, 5 R.I. 340, 342 (1858); 3 Restatement (Second) *Torts* § 578 (1977); Prosser and Keeton, *Torts* § 113 at 799 (5th ed. 1984).

A good statement of this rule is set forth in *Olinger v. American Savings and Loan Association*, 409 F.2d 142, 144 (D.C.Cir. 1969):

"The law affords no protection to those who couch their libel in the form of reports or repetition. * * * [T]he repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement."

The republication rule applies to the press as it does to others. *Cianci*, 639 F.2d at 61.

■ Although the press is entitled to a number of privileges relating to fair comment, neutral reportage, and the expression of pure opinion, there is no constitutional value in false statements of fact. *See Gertz*, 418 U.S. at 339–40, 94 S.Ct. at 3007, 41 L.Ed.2d at 805.

■ Consequently, the appropriate inquiry to be submitted to the triers of fact in the instant case was not whether such rumors existed but whether the rumors were based upon fact or whether they were false. If the answer to the first question was that the rumors were false, we would then come to the question posed by *New*

---

1. *See* Note, *Libel and the Reporting of Rumor*, 92 Yale L.J. 85, 86 n. 7 (1982) ("major characteristic of rumor is that it has no identifiable source but rather is repeated by many people");

*see also Smith v. Moore*, 74 Vt. 81, 86, 52 A. 320, 321 (1902) (rumor is "a flying or popular report, the common talk * * * not the remarks of a single person").

*York Times*, 376 U.S. at 279–80, 84 S.Ct. at 726, 11 L.Ed.2d at 706, as made applicable to a public figure pursuant to *Curtis Publishing Co.*, 388 U.S. at 152–54, 87 S.Ct. at 1990–91, 18 L.Ed.2d at 1109–10, namely, whether the publication of such rumors was made with knowledge that they were false or with reckless disregard of whether they were false or not.

It seems obvious beyond question that the publication of rumors that the writer of the article stated were based upon the stretching of available facts and "imaginations" would create a jury question concerning whether the publication was made with "actual malice," namely, knowledge that the statement was false or with reckless disregard of whether it was false or not. *DeCarvalho*, R.I., 414 A.2d at 810. Even if the reporter or publisher might not have had actual knowledge of the falsity of the rumors, either one certainly had sufficient doubts about their truth to make it a question of fact about whether the statements had been published with reckless disregard of whether they were false or not.

The trial justice was in error when he submitted to the jury only the question of the existence or nonexistence of the rumors. This was not an appropriate application of the *New York Times* "actual malice" test under the facts of the case at bar.

### III

WAS THE PUBLISHED MATERIAL OF RUMORS PROTECTED BY EITHER THE DOCTRINE OF FAIR REPORT OR THE DOCTRINE OF NEUTRAL REPORTAGE?

We would be remiss at this point if we did not fully dispose of an argument that is advanced by defendants in this case and which has been asserted elsewhere in situations similar to that in the instant case.

What is argued is that there are at least some instances in which a newspaper should not be barred from reporting the existence of defamatory statements, including rumors, if only for the fact that the making of such statements is newsworthy in itself. This argument undoubtedly derives its basis from the common-law privilege of fair report and the more recent doctrine of neutral reportage as suggested in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 120 (2d Cir.), *cert. denied sub nom., Edwards v. New York Times Co.*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).

The common-law privilege of fair report protects the publication of fair and accurate reports of public meetings and judicial proceedings, even when an individual is defamed during the proceeding or action.[2] This privilege does not abrogate the policy of protecting one's reputation but rather subordinates this value to the countervailing public interest in the availability of information about official proceedings and public meetings.

"Because the public or social interest being accommodated is the public's interest in receiving information from public meetings and official proceedings, the privilege is unaffected by the republisher's knowledge of the falsity of the statement reported." Comment, *Edwards v. National Audubon Society, Inc.: A Constitutional Privilege to Republish Defamation Should Be Rejected*, 33 Hastings L.J. 1203, 1206 (1981–82).

The defendants argue by analogy that the underlying concept of fair report should similarly protect republishing a rumor already in existence, even in the face of knowledge of its falsity. We are of the opinion, however, that there is little merit to this argument, especially in light of the contours of this case.[3] It is important to

---

2. *Curry v. Walter*, 126 Eng.Rep. 1046 (1796). *See* Comment, *Edwards v. National Audubon Society, Inc.: A Constitutional Privilege to Republish Defamation Should Be Rejected*, 33 Hastings L.J. 1203, 1206 (1981–82).

3. We similarly reject defendant's position that since the rumors in this case constituted opinion, defendants were thus protected in republishing others' opinions. The rumors in this case connecting Martin with fires were certainly

observe that the fair-report privilege accommodates the important societal interest in facilitating dissemination of information about judicial and governmental proceedings at which identified and identifiable persons may participate in resolving disputes and advancing the progress of government. In a judicial proceeding if one is defamed through cross-examination, opportunity exists for the one defamed to respond to rebut the defamation. With public meetings those susceptible of defamation may attend such gatherings and defend against attacks. Comment, 33 Hastings L.J. at 1211 n. 47. We find no similar countervailing policy to protect repetition of rumors. The spreading of rumors does not give the person defamed by them the opportunity to rebut the underlying allegations of the rumor. To attempt to defend against a rumor is not unlike attempting to joust with a cloud. Publication of a rumor further fuels the continued repetition and does so in an especially egregious way by enshrining it in print. *See Metcalf,* 20 R.I. at 678, 40 A. at 865 (for analysis limiting doctrine of reporting of judicial proceedings). Thus there is little room to deny that the opportunity for abuse of the reporting of the existence of a defamatory rumor is great,[4] and as a result a number of courts (and today we join them) have denied the right to report the existence of rumors when the underlying accusation of the rumor is believed to be false. *See, e.g., Cianci,* 639 F.2d at 60–61 (publisher incurs liability under actual-malice standard if he knew of falsity, regardless of attribution); *Dickey v. CBS, Inc.,* 583 F.2d 1221, 1226 (3d Cir.1978) (rejecting argument that "false statements by a third party which have been published by the press, are entitled to a unique constitutional analysis"); *Goldwater v. Ginzburg,* 414 F.2d 324, 337 (2d Cir.1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970) (citing *St. Amant v. Thompson,* 390 U.S. 727, 732,

88 S.Ct. 1323, 1326, 20 L.Ed.2d 262, 267–68 (1968)) (repetition of another's words does not release one from responsibility if repeater knows that words are false or inherently improbable or if there are obvious reasons to doubt veracity of person quoted or accuracy of his reports); *Catalano v. Pechous,* 83 Ill.2d 146, 168, 50 Ill.Dec. 242, 264, 419 N.E.2d 350, 361 (1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). *See generally Greenbelt Cooperative Publishing Association, Inc. v. Bresler,* 398 U.S. 6, 23, 90 S.Ct. 1537, 1546, 26 L.Ed.2d 6, 19–20 (1970) (White, J., concurring). *But see Medina v. Time, Inc.,* 439 F.2d 1129, 1130 (1st Cir. 1971).

From a slightly different point of view, defendants argue that a rule precluding reportage of a third person's defamatory remarks would act as a perpetual bar to ever reporting that a third person has made such remarks or that defamatory rumors were circulating in a community. A case that arguably would allow such reportage is *Edwards, supra,* in which a defamation suit arose in the aftermath of a raging controversy between the proponents of the pesticide DDT and the National Audubon Society. The society claimed that the proponents had misinterpreted data relevant to the controversy and accused as "paid liars" certain scientists who used such data to aid the pesticide proponents' cause. A reporter for the New York Times accurately reprinted the accusations, the names of the scientists, and their outraged denials. *See* Case Comment, *Restricting the First Amendment Right to Republish Defamatory Statements,* 69 Geo.L.J. 1495, 1498 (1981). In the ensuing litigation that reached the United States Court of Appeals for the Second Circuit, Chief Judge Kaufman, writing for the court, held that "when a responsible, prominent organization like the National Audubon Society makes seri-

---

not opinion in that they embodied an underlying defamatory statement of fact. *See Cianci v. New Times Publishing Co.,* 639 F.2d 54, 61–64 (2d Cir.1980).

4. *See* Note, *Protecting the Public Debate: A Proposed Constitutional Privilege of Accurate Republication,* 58 Tex.L.Rev. 623, 637–38 (1979–80).

ous charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity." *Edwards,* 556 F.2d at 120. Reasoning that "[w]hat is newsworthy about such accusations is that they were made," *id.,* the court concluded that the reporter should not have been required to suppress the story merely because he may have had serious doubts concerning the truth of the charge.

We are constrained to conclude, however, that there is a remarkably wide gulf between *Edwards* and the case at bar. In *Edwards* the court emphasized the existence of a prominent responsible organization originating the charges. This itself has been argued to have been newsworthy. With rumors, however, any such characteristics are wholly absent. A rumor by definition is anonymously spawned, and those who give it currency, if their identity can be ascertained, certainly do not take any responsibility for its truth. *See supra* note 1. In *Cianci,* 639 F.2d at 69–70, the United States Court of Appeals for the Second Circuit noted that:

"The need for the careful limitation of a constitutional privilege for fair reportage is demonstrated by the breadth of that defense, which confers immunity even for publishing statements believed to be untrue. Absent the qualifications set forth by Chief Judge Kaufman in *Edwards,* all elements of the media would have absolute immunity to espouse and concur in the most unwarranted attacks, at least upon any public official or figure * * * by persons known to be of scant reliability."

■ We believe that this portion quoted from *Cianci* supports a rule that republication of false defamatory statements about an individual may be printed only in the extremely limited situation in which the publication accurately attributes such statements to an identified and responsible source. Assuming, without deciding, that *Edwards* as limited by *Cianci* is a correct statement of this aspect of the law of libel,[5] we find this principle to be wholly inapplicable to rumors since a responsible source is lacking. Moreover, we discern no public policy which would be served by immunizing the reporting of false or baseless rumors. The need to report judicial and governmental proceedings is not paralleled by any discernible advantage to be secured to the public by the reporting of rumors. Consequently, publication of such rumors makes the publisher responsible under the "actual malice" test of *New York Times* for ascertaining the truth of the underlying defamatory material in such circumstances.

IV

OTHER ISSUES

In concluding this opinion, we now address additional claims of plaintiff who asserts error in two evidentiary rulings by the trial justice. One of these relates to an outstanding motion to compel a deposed witness to answer a question propounded by plaintiff in connection with the discovery in this case. Before the court's order to compel could be complied with, the case had proceeded to trial at which proceedings the witness was unavailable. We need not address this issue at length since there is no indication that this witness would be unavailable at a subsequent trial

**5.** We are not entirely convinced of the soundness of the rationale of *Edwards* in suggesting that immunity be conferred for republication of charges against a public figure when made by a responsible organization. In effect this rationale is redundant to the principles enunciated in *New York Times.* The question of whether material is published with knowledge of falsity or reckless disregard of whether it is true or false

in substance would require the trier of fact to consider the credibility or responsibility of the source upon which the publication is based. Therefore, it is questionable whether an additional layer of privilege is required. We shall, however, await a case which squarely presents this question before determining whether to accept or reject the *Edwards* doctrine.

or even that beforehand the outstanding order could not be complied with.

Another issue raised concerns plaintiff's objection to the trial justice's admission of portions of plaintiff's cross-examination of the same witness mentioned above who was deposed but who was later unavailable for trial. The plaintiff contends that defendant's counsel should not have been allowed to read plaintiff's cross-examination of this witness and that the trial justice was in error in refusing to give plaintiff the sole prerogative to admit or omit portions of plaintiff's cross-examination of this witness. We find no merit in this claim. Rule 26(d)(3) of the Superior Court Rules of Civil Procedure plainly states that "[t]he deposition of a witness, whether or not a party, may be used *by any party for any purpose* if the court finds * * * (iii) that the witness is unable to attend or testify * * *." Super.R.Civ.P. 26(d)(3) (1966). (Emphasis added.) We believe that the plain language of this rule clearly applies to the instant situation and is dispositive. *See Cleary v. Indiana Beach, Inc.,* 275 F.2d 543, 550–51 (7th Cir. 1960). This issue is without merit.

A third additional issue is raised by the defendants, who cross-appeal from the denial of their motions for directed verdict. For the reasons set forth under part 2 of this opinion, we are of the opinion that a trier of fact might properly determine that the article in question was defamatory per se and unprivileged. Consequently, it is clear that the defendants were not entitled to a directed verdict in their favor. Therefore, the defendants' cross-appeal is denied and dismissed without further comment or analysis.

For the reasons stated, the plaintiff's appeal is sustained. The papers in the case may be remanded to the Superior Court for a new trial in accordance with the principles set forth in this opinion.

The Chief Justice participated in the oral argument and in the decision of the court, but he did not participate in the publication of the formal opinion.