MARSHALL CONTRACTORS, INC.

v.

BROWN UNIVERSITY.

No. 94–505–Appeal.

Supreme Court of Rhode Island.

April 3, 1997.

Albert R. Romano, Lauren E. Jones, Providence, for Plaintiff.

Christopher H. Little, Fran Robins–Liben, Providence, for Defendant.

Before WEISBERGER, C.J., and BOURCIER and FLANDERS, JJ.

## OPINION

BOURCIER, Justice.

The plaintiff, Marshall Contractors, Inc. (Marshall), appeals from the entry of final judgment in the Superior Court in favor of the defendant, Brown University (Brown). The Superior Court litigation, tried before a jury, concerned a dispute over payment for the construction of the Paul Bailey Pizzitola Memorial Sports Facility on Lloyd Avenue in the city of Providence. In this appeal Marshall alleges a number of trial court errors. Because we conclude that the trial justice erred in finding that a contract, implied-in-fact, "on the essential terms of the contract" had resulted from ongoing contract negotiations between the parties, we reverse the trial court judgment and need not address Marshall's other claims of error. The facts pertinent to our conclusion are as noted.

I

On April 11, 1986, Brown's director of physical planning, Carol Wooten (Wooten),

requested Marshall, along with three other general contractors, to submit design and construction proposals for a new university sports complex facility to replace its time honored but age weary Marvel Gymnasium. At that time Brown estimated that the basic building's construction cost would be $4.5 million.

On August 5, 1986, Marshall submitted its design/build proposal to Brown with a bare construction cost of $4,627,134 or $61.50 per square foot in accordance with the scope of work then outlined in Marshall's proposal. Marshall's proposal was selected by Brown, and on May 12, 1987, Brown authorized Marshall to proceed with formal design development of its proposal. In addition, Brown authorized Marshall to commence site work and to relocate utilities at the building site although no formal contract had yet been executed in order to accommodate the project's so-called fast track construction schedule plan.

The formal design development work resulted eventually in the final design construction plans for the project and, on October 19, 1987, Brown, in a letter from E.F. Wallace, director of its department of purchases, informed Marshall of Brown's intention to enter into a contract with Marshall for the base construction sum of $6,988,114. On November 11, 1987, Brown in a letter from its associate director of physical planning, Edward J. Luppi, authorized Marshall to proceed with the construction of the new sports facility and reflected changes in the construction plans that increased the contract basis of compensation to $7,157,051.

In that letter of intent Luppi notified Marshall that

"[w]e would also like to list the items accepted or agreed upon since the Letter of Intent, whose value added to the 19 October letter will become the contract basis of compensation. Any changes from this point forward shall become a Change Order to the forthcoming contract."

That November 11, 1987 final letter of intent also noted that there would be a "forthcoming" formal contract for the project based on the $7,157,051 figure.

Unfortunately, no forthcoming written construction contract, ready for signature execution, ever emerged from the ongoing contract negotiations between the parties because of their constant disagreement over what the "scope" of the project included, was intended to be, or how it was to be defined. Resolution and agreement on that scope of project item was central to the contract negotiations especially in light of Brown's November 11, 1987 letter of intent fixing a $7,157,051 limit on the project cost.

Complicating the continuing disagreements between the parties during the ongoing construction were the varied, but many change orders that were submitted by Marshall for work it claimed was not included in the scope of the project as well as billings by Marshall for "extras" that it believed were also not included within that scope. The crucial importance in all of that scope jousting is that each party had its own separate belief of what the project scope actually encompassed, and that mutual misunderstanding was never mutually resolved.

Marshall, apparently dismayed by the ongoing project scope disagreements, and expecting to resolve the ongoing dispute over what constituted the scope of the project, forwarded Brown a document entitled "Standard Form of Agreement Between Owner and Design/Builder" for Brown's approval. That proposed agreement was intended to be the formal contract for the project, and included what Marshall believed to be the definition of the scope of the project. Brown, however, rejected the proposed form contract as submitted, and instead proposed changes therein relating to overtime labor costs, time of payments due for work, and most significantly, the form contract's definition of scope of the project. The parties, while each wanting to execute a formal contract, could simply not agree upon what certainly had to be one of its most important provisions, namely, the scope of the project, in light of Brown's stated monetary limitation on what it wanted to spend for the total project. Despite that inability of the parties to reconcile their differences over the terms to be included in the project contract, construction nonetheless continued without interruption. As that con-

struction neared completion, Marshall, on January 17, 1989, wrote to then university president Howard Swearer (Swearer) in an attempt to resolve the scope-billing disagreements that had by that time accumulated to close to $1 million. Marshall, in its letter, advised Swearer that the projected final cost to Brown would be $8,674,811, of which $881,499 involved disputed work change orders that Brown had claimed were all included within the original scope of the project. Marshall requested to meet with Swearer and resolve the scope of project and billing problems. All attempts to do so, however, met with little, if any, success. Finally, on November 3, 1989, Marshall filed a civil action against Brown in the Providence County Superior Court seeking to recover for the construction costs that it believed were not included within the original scope of the project.

In its civil action, Marshall sought recovery for the cost of construction work furnished during the construction of the sports facility that it believed was not originally included in the scope of the project. It alleged in its three count complaint, claims for unjust enrichment (count 1), quantum meruit (count 2), and "wilful and intentional bad faith and coercion" (count 3). Brown, answering Marshall's complaint, asserted that a contract had in fact materialized between the parties in which they had mutually agreed to a lump sum of $7,157,051 for the scope of the project and that it had complied with its financial obligations required by that contract. Marshall, in its complaint, requested a trial by jury. It got what it requested, but it did not get what it expected, and as a result its appeal from the final judgment in favor of Brown is now before us.

## II

Prior to the commencement of the jury trial on Marshall's complaint in the Superior Court, the parties on April 9, 1993 met with the trial justice and agreed that the first disputed issue that should be litigated was whether any contract had in fact been agreed upon by the parties. For that specified purpose, the trial justice bifurcated the trial, taking up first, without a jury, the question of whether a contract had come into existence between the parties. Both Marshall and Brown presented evidence at that initial part of the bifurcated trial in support of their respective contract and no contract positions.

Marshall, at that initial trial, contended that the parties had never emerged from the contract negotiation process stage and had intended only to be bound by a formal written document that would define, specifically, the scope of the project. In particular, Marshall relied upon a letter written by Stephen Laskowski (Laskowski), Marshall's project manager, as well as upon a memorandum written in July of 1988 by Wooten to support its contention. The Laskowski letter had been written on November 10, 1987, in response to an earlier letter from Wooten in which she had attempted to bind Marshall to pay for all unexpected costs of the project. The Laskowski letter replied in part:

"We must comment on the last sentence of the second paragraph and ask that it be amended to state, 'Per our agreement with Jack Marshall, all other unexpected costs within Marshall Contractors, Inc.'s project scope are to be borne by Marshall Contractors, Inc.' "

The 1988 memorandum from Wooten provided:

"There are two major areas of disagreement between Brown and Marshall outlined below. Any agreement, if made, should settle all of these items.

A. Differences between Brown's original April 11, 1986 program (RFP) versus Marshall's August 5, 1986 Design Build Proposal. We feel strongly that *both* must be made part of the contract. Marshall wants only their proposal to be included.

B. There are major items which, according to Marshall, have posed financial problems for them. Brown's position has been that these are not University requests nor did we in any way cause them."

Marshall asserted that those documents proved conclusively that the parties at all times remained postured in the initial contract negotiating stage during the ongoing construction and they had never reached mutual agreement upon a formal contract, that

included a mutual understanding of the scope of the project envisioned in Brown's $7,157,051 cost cap limitation.

Brown, on the other hand, contended that the parties had by their negotiations created an implied-in-fact contract. Brown asserted that even though the parties had not executed a formal written document or formally agreed to every specific item that was to be put into the construction, they had notwithstanding mutually agreed upon the material terms for the construction project and had all the while intended to be bound to those material terms prior to the execution of any formal contract. To support its view, at the initial hearing, Brown presented testimony from Wooten, who testified, "[W]e had an agreement—we did not have a signed formal AIA [American Institute of Architects] contract." Brown also introduced a letter written by Laskowski that purported to bind Marshall to $7,157,051 as the contract basis of compensation.

At the conclusion of the initial segment of the bifurcated trial, the trial justice concluded and ruled in his bench decision that on or about May 1, 1987, an implied-in-fact contract had materialized between the parties with regard to the essential terms of the project. In reaching his decision he stated that

"the conduct of the parties, the scope in the proposal, the scope of the response, the proposal to build by Marshall, which was accepted by Brown University forms, in the Court's judgment, an agreement on the essential terms of the contract."

■ The trial justice, on September 23, 1993, then ordered that Marshall's quantum meruit and unjust enrichment theories for recovery would not be submitted to the jury at the remaining segment of the bifurcated trial. He instructed the parties that Marshall, at the jury trial, would only be permitted to seek recovery for work it had performed that qualified as contract extras, and, for work performed and materials furnished that were outside the agreed upon scope of

the implied-in-fact contract. The trial justice in his ruling stated:

"It seems to me that although no written document was executed, that there was an agreement as to the essential elements. For that reason, the Court will not submit any Quantum Meruit count to this jury, but will rely upon the law of the case, and the damages will relate to those recoverable in a contract action alleging a breach of the contract, in that the plaintiff was required to do extras which were outside the terms of the contract, and is entitled to recover for the value of those items which a jury will determine are outside the terms of the contract."

Following that ruling, the parties then engaged in extended pretrial discovery, and later, on February 28, 1994, the case was finally reached for trial before a jury. At the conclusion of the presentation of Marshall's case in chief, Brown moved for a directed verdict,[1] alleging that Marshall had failed to prove any damages because it presented no evidence of specific costs for work performed and for materials furnished that were beyond the scope of the contract. Brown asserted in support of its motion that despite the trial justice's earlier September 23, 1993 ruling, Marshall had nonetheless proceeded at trial to pursue its claims based on a quantum meruit basis. Marshall countered that its case presentation was based on a contract theory as the trial justice had ruled, asserting the distinction that a contract did exist in regard to the scope of the work but did not exist in regard to the cost of the project, and that rather than seek to recover for extras outside the scope of the contract, it was now instead seeking to recover for the reasonable value of its costs plus a profit.[2] The trial justice, after denying Brown's motion for judgment as a matter of law, then permitted Marshall to amend its pleadings to conform to its newly asserted trial theory that while no formal agreement had ever materialized, under the implied-in-fact contract, as earlier found by the trial justice, Marshall was enti-

---

1. Now referred to as a motion for judgment as a matter of law. *See* Super R. Civ. P. 50.

2. The term "cost-plus contract" is reserved for contracts wherein there is an express cost agreement and not where the cost term is absent. *See* 17A Am.Jur.2d *Contracts* § 508 at 520 (1991).

tled to recover its reasonable costs plus a profit.[3]

Brown, in the presentation of its case, sought to prove that the parties had not only agreed to the cost of the project, but as well, to what the scope of the project included and that those agreements had ripened into a binding implied-in-fact contract. Brown asserted that it had complied with all of its financial obligations to Marshall arising out of that contract.

At the conclusion of the trial and following counsel's summations to the jury, the jury returned a general verdict in favor of Brown. Marshall, on March 31, 1994, moved for a new trial, and after hearing thereon, the trial justice denied Marshall's motion. This appeal followed.

### III

■ We begin our analysis of this appeal with an examination of the trial justice's initial decision that an implied-in-fact contract had been formed on or about May 1, 1987, between Brown and Marshall. Although no formal contract document was ever executed by the parties, the trial justice nevertheless found that the parties, by their conduct and their communications, evidenced mutual agreement with regard to the material terms that were to be included in the intended formal contract as well as their simultaneous mutual intention to be bound prior to the formal execution of that contract. This is commonly referred to as an implied-in-fact contract. It is a form of express contract wherein the elements of the contract are found in and determined from the relations of, and the communications between the parties, rather than from a single clearly expressed written document. *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2nd Cir.1985); *J. Koury Steel Erectors, Inc. v. San–Vel Concrete Corp.*, 120 R.I. 360, 365, 387 A.2d 694, 697 (1978); *Bailey v. West,*

105 R.I. 61, 64, 249 A.2d 414, 416 (1969); *LiDonni, Inc. v. Hart,* 355 Mass. 580, 246 N.E.2d 446, 449 (1969); 1 *Williston on Contracts* § 1:5 (4th ed. Lord, 1990). The difference between an express contract and an implied-in-fact contract is simply the manner by which the parties express their mutual assent. *A and B Construction, Inc. v. Atlas Roofing and Skylight Co.,* 867 F.Supp. 100, 108 (D.R.I.1994); *J. Koury Steel Erectors, Inc.,* 120 R.I. at 364–65, 387 A.2d at 697; *see 1 Corbin on Contracts* § 18 at 41 (1963).

■ We find clear error in the trial justice's initial determination that on or about May 1, 1987, an implied in fact contract materialized from the parties' conduct, actions, and correspondence with regard to what precise construction items were intended by the parties to be included in the scope of the project with its intended $7,157,051 cost cap. The letters from Marshall to Brown and from Brown to Marshall during the construction work point only to an ongoing contract negotiation process aimed at eventually defining what the scope of the project, precapped with a $7,157,051 cost limit it would include. *See Rhode Island Five v. Medical Associates of Bristol County, Inc.,* 668 A.2d 1250, 1254 (R.I.1996). The inability of the parties to ever reach mutual agreement on what the scope of the project was intended to include certainly constituted the very heart and vital essence of their ongoing contract negotiations and prevented the emergence and the existence of any implied in fact contract. *Winston,* 777 F.2d at 80, 1 *Corbin on Contracts,* § 1.2 (Perillo rev. ed. 1993); 1 *Williston on Contracts,* at §§ 1:3, 1:5.

As noted earlier, Brown's director of physical planning on May 12, 1987, authorized Marshall to commence design work for the project without the existence of a contract. Some twenty-seven months later, in July

---

**3.** Marshall's subsequent reasonable costs recovery position, and the trial justice's acquiescence therewith, appears to contradict the trial justice's initial determination that Marshall could not seek to recover under a quantum meruit theory. "It is well settled that where there is an express contract between the parties referring to a subject matter, there can be no implied contract arising by implication of law governing the same subject matter." *See, e.g., Mehan v. Gershkoff,* 102 R.I. 404, 409, 230 A.2d 867, 869–70 (1967); *Cass–Warner Corp. v. Brickman,* 126 Vt. 329, 229 A.2d 309, 314 (1967). We need not, however, further address this concern in light of our disposition of this appeal.

1988, that same director, Wooten, in a memorandum to Marshall's project manager, wrote that she acknowledged two remaining "areas of disagreement between Brown and Marshall," one of which was Brown's original April 11, 1986 program or scope of project and "Marshall's August 5, 1986 Design Build Proposal." That memorandum to Marshall's project manager, some fourteen months after the time that the trial justice found that mutual understanding and agreement had been reached between the parties regarding the scope-of-project dispute, certainly serves to subvert the soundness of this finding. Further undercutting the soundness of the trial justice's May 1, 1987 implied-in-fact contract finding is the uncontradicted evidence that on December 21, 1987, some seven months after the implied contract was found to have come into existence by virtue of the mutual assent of the parties, Marshall submitted to Brown its proposed contract in the form of a "Standard Form of Agreement Between Owner and Designer/Builder," containing a specific definition of what it believed the scope of the project to be. Brown rejected that proposed contract, in main, because of its differing understanding of what the scope of the project was intended to include, and submitted in return what constituted a counteroffer to Marshall's proposal containing its different definition of what it believed the scope of the project to be. Clearly at this point, there existed only Marshall's proposed contract including its understanding of what the scope of the project included; Brown's rejection of that proposal, and Brown's counteroffer and proposal that Marshall never accepted or agreed to. We are hard pressed to accept on those facts the trial justice's finding that mutual agreement regarding the meaning of the scope of the project had been arrived at by the parties on or about May 1, 1987. It is inconceivable that the parties, experienced as they were in their respective roles, would ever bind themselves to a project of such enormity and cost, without first agreeing upon what Marshall was to build in return for Brown's $7,157,051. We are persuaded that the trial justice overlooked and misconceived the materiality of the trial evidence concerning the nature of the ongoing contract negotiations and that he

was clearly wrong in concluding therefrom that an implied-in-fact contract had resulted. The trial evidence clearly demonstrated the ongoing futile attempts by both parties to reach a final mutual understanding of what Brown expected of Marshall, and what Marshall expected in return from Brown.

 We acknowledge that the resolution of a dispute concerning if and when contract negotiations materialize into a mutual understanding and resulting binding contract is ordinarily a question of fact for the factfinder. We acknowledge also that findings of a trial justice will be given great weight on appeal and will not be disturbed unless shown to be clearly wrong, or that the trial justice has "misconceived or overlooked relevant evidence on a crucial issue." *Fournier v. Fournier*, 479 A.2d 708, 715 (R.I.1984).

Where, however, as here, the record evidence unerringly points only to the conclusion that the parties never did mutually agree upon what construction work was to be encompassed within the projected scope of the project, in light of the cost of the project as envisioned by Brown, the determination of the mutual assent necessary to constitute binding contract status was a question of law. *Fournier*, 479 A.2d at 715; *DeNardo v. Fairmount Foundries Cranston, Inc.*, 121 R.I. 440, 449, 399 A.2d 1229, 1234 (1979). *See also Bina v. Providence College*, 39 F.3d 21, 27 (1st Cir.1994); *Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 7–8 (1st Cir.1994).

## IV

From our review of the trial record, we are persuaded that the parties at no time ever reached mutual understanding and agreement upon the most vital of the intended contract terms, namely, the scope of the work that Marshall was required to perform in light of the cost of the project as envisioned and set by Brown. The trial justice, in concluding, as a question of fact, that mutual understanding and agreement had been reached, misconceived the relevant trial evidence on that issue and, as a result, failed to conclude as a matter of law that no mutual

agreement had been reached between the parties.

The plaintiff's appeal is sustained. The final judgment entered below is vacated, and the case is remanded to the Superior Court for a new trial.

LEDERBERG, J., did not participate.