DECISION
This matter came on before the Court for trial, jury waived.
 A. Findings of Fact
Trombino's Folly, LLC is the owner of buildings and property at 5259 Post Road, Charlestown, Rhode Island. The building was formerly the home of Josie's Restaurant. As some of the buildings were vacant, Steven Washburn approached Chad Trombino about the possibility of locating a real estate office at the location.
On January 18, 2007, the parties executed a written lease (Ex. 2), drafted by Mr. Washburn's attorney. The lease provides that Mr. Washburn would lease 950 square feet of the restaurant building for two years "at no rent on condition that the Tenant/Lessee shall remodel the leased premises to the satisfaction of the Landlord/Lessor and the Tenant/Lessee." Mr. Washburn executed the lease. At Chad Trombino's request, Michael Trombino executed the lease as manager for Trombino's Folly, LLC.
Mr. Washburn's plan was to convert some of the space which was previously used as a restaurant, and to use it for real estate sales. Mr. Washburn was an experienced and registered building contractor, familiar with construction and permitting processes. Although the lease called for rental of 950 square feet, it was understood that the *Page 2 
Trombinos would continue to occupy another portion of the same building. As Chad Trombino was on site with Mr. Washburn and some of Mr. Washburn's employees, they would occasionally assist each other in their respective construction projects. Chad Trombino had previously received and posted a building permit for repairs to the roof of the building. Flooring, electrical, plumbing and carpentry work continued for several months, without a building permit.
As the construction continued, Mr. Washburn learned that the restaurant had been a nonconforming, preexisting use and therefore was permitted by zoning. Chad Trombino was successful in obtaining some permits but never agreed to obtain all necessary permits for all construction. On March 13, 2007, the Charlestown Town Planner wrote that use of the building as a real estate office was allowed as "a less intense use" but conditioned the approval on "submittal of construction drawings for approval . . . prior to the issuance of a building permit." (Ex. 3.)
As the planner's letter requested submission of construction drawings prior to issuance of a building permit, Chad Trombino cautioned against further construction work. As a result of these conversations and the planner's letter, Mr. Washburn believed that a stop work order had been issued by the Town preventing additional renovations. To cure this problem, Mr. Washburn agreed to take over the permitting and to seek a fire alarm permit. While the Dunn's Corner Fire District approved a new fire alarm plan (Ex. 4), it has not been established that the fire alarm plan was permitted or that any additional building permits were issued. Eventually, Mr. Washburn purchased alarms and planned to do the installation of the alarms himself. *Page 3 
In May 2007, Chad Trombino received a copy of the fire district approval but it did not have a stamp on it, nor was it a building permit. When he received the plan, he asked Mr. Washburn for proof that the permit existed and asked him to stop working until the permit had been issued. Chad Trombino also went to certain town officials, and it was his understanding that no new permit had been issued for construction. The Trombinos refused to pay additional costs for installation of the fire alarm. Without any active permits in place and fearing regulatory action, Mr. Trombino asked Mr. Washburn's employees to leave.
In June 2007, counsel for the Trombinos asked for copies of the plans and permits, expressing concern that work had been done without building permits. No permits were forwarded.
In September 2007, still at a standstill and unable to access the premises, Mr. Washburn instituted this litigation.
 B. Presentation of Witnesses
Mr. Washburn's case commenced by calling a principal of the Defendant company, Chad Trombino. Mr. Trombino is a landscaper and identified himself as a manager of Trombino's Folly, LLC. While he was prepared and consistent, he was not very sophisticated on commercial leasing and financing. The Court had no reason to question his credibility as the trial progressed, until tempers flared. Eventually, Mr. Trombino reluctantly acknowledged that during the past four years he had begun to use the disputed area that Mr. Washburn allegedly leased. At that point, Mr. Trombino's *Page 4 
credibility lessened, but his description of the events during the construction phase seemed accurate and unquestioned.
The second witness was Wesley Zebzda, who performed some construction work under the direction of Chad Trombino. Apparently his testimony focused on whether the Trombinos procured a building permit (a fact which Mr. Zebzda had limited knowledge of), and whether the Trombinos were either credible or honorable (as he had a falling out with them in 2000). The Court had no reason to doubt Mr. Zebzda's testimony, though it added little substance to the major issues in dispute here.
Mr. Washburn seemed quite credible on direct examination. Although he was informally attired, he appeared highly educated, thoughtful in his responses, and sophisticated in contracting and real estate. He was well prepared. On cross-examination, his credibility faltered. The size of his construction firm, his education and his credibility were all placed into serious question.[1] Mr. Washburn also attempted to control the examination by responding to legal objections and adapting his testimony to circumvent objections. Instead of simply responding to the questions posed, his answers were couched in self-serving replies. His inconsistent responses on cross-examination, compared to his answers on direct, caused the Court to seriously doubt his credibility. For example, when told to produce receipts for constructions materials, he snapped at any questioning of the receipts. Some receipts produced were later shown to be for other jobs. The time sheets were also questionable. He indicated he paid wages to numerous *Page 5 
employees, but faced with proof to the contrary and the possibility of criminal implication, he backtracked, and his attorney withdrew the evidence.
Mr. Washburn's actions also leave the Court to question his veracity. If he was anxious to protect his substantial investment, and armed with a lease, it is curious that he left the premises promptly upon Mr. Trombino's request. It would have been reasonable for him to seek prompt equitable relief. From the file, it does not appear that he ever sought a restraining order or an injunction to return to the premises, which sat dormant for four years. Though he claimed a continued desire to return to the unit, he never sought to do so during the interim. Instead, his case focuses on money damages. Finally, Mr. Washburn's demeanor left the Court to doubt his credibility and motives.[2]
Two experienced South County realtors testified regarding the value of the premises. Edward Caswell, Jr. presented an appraisal. It seeks to ascertain the rental value of the disputed unit based on the assumption that all remodeling work was completed by Mr. Washburn. The work was not completed. Mr. Caswell estimated that ninety percent of the construction work was complete, though it would take three to six additional months to finish the project. Mr. Caswell categorized this single commercial unit as comparable to a new, fully constructed, multi-unit, high grade commercial development in the county. While the Court had some familiarity with Mr. Caswell's fine reputation, his expertise was never placed into evidence by either side. He used an odd formula to justify his use of comparables, deemphasizing any focus on the overall commercial market of the area. It was not clear which appraisal approach he used in his analysis (comparable, income or another), so his testimony was of limited value. *Page 6 
Mr. Lenihan, another experienced realtor in the area, submitted a market analysis. During testimony, he was quick to say that his work did not constitute an appraisal. His testimony seemed more logical as he explained his hands-on understanding of the properties in the nearby market, and distinguished other properties he wanted to ensure that should not be used as comparables. Although Mr. Lenihan did not use a formal appraisal analysis, his rental value seemed reasoned and appropriate. While he never questioned Mr. Caswell's ability or reputation, Mr. Lenihan sufficiently convinced the Court that the data used by Mr. Caswell was not appropriate to justify an appraisal to any degree of certainty.
Mr. Michael Trombino testified, and is Chad Trombino's father. Also a manager of Trombino's Folly, LLC, he was reluctant to testify at all. While his answers seemed to be evasive at first, the fact finder concluded that his involvement with the property was very limited. Chad Trombino appears to have managed the real estate on a day to day basis and completed the negotiations with Mr. Washburn. The Court had no reason to doubt Michael Trombino's credibility, even though he limited the scope of his own recollection.
Although there was extensive testimony and evidence presented concerning the amount of the damages to Mr. Washburn, the Court will not review this testimony for purposes of brevity and for the reasons which will become more obvious as a result of the discussion below. *Page 7 
 C. Analysis
1. Mr. Washburn has Failed to Establish a Breach ofContract.
Mr. Washburn's first claim was that the Defendant breached the agreement with him. The long established essential elements of a contract are "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation."Rhode Island Five v. Medical Associates of Bristol County,Inc., 668 A.2d 1250, 1253 (R.I. 1996) (citing
Black's Law Dictionary 332 (6th ed. 1990)); andLamoureux v. Burrillville Racing Association,91 R.I. 94, 161 A.2d 213, 215 (1990).
The lease agreement created a binding, enforceable contract. All of the essential elements were satisfied, and both parties commenced performing pursuant to the contract terms.
 Generally, whether a party materially breached his or her contractual duties is a question of fact. If the issue of material breach, however, admits of only one reasonable answer, then the Court should intervene and resolve the matter as a question of law. A party's material breach of contract justifies the non-breaching party's subsequent performance of its material obligations. Parker v. Byrne, 996 A.2d 627, 632-33 (R.I. 2010) (quotations and citations omitted).
However, this is not an action seeking specific performance. Mr. Washburn's initial claims were seeking damages resulting from its alleged mechanics' lien and for breach of contract.
Once the Court establishes that a contract exists, the case rests on mere finger pointing: Each party alleges the other was responsible for procuring a building permit to do the work anticipated by the lease terms and claiming that the other party's failure to obtain building permits constituted a material breach. Unfortunately, the lease agreement *Page 8 
does not explicitly indicate who is responsible to procure the building permit ? the builder/lessee or the landlord. Of course, Mr. Washburn bears the burden of proof on his claims.
Although the owner may apply for the building permit, a lessee of property also has standing to apply. R.I.G.L. § 23-27.3-113.3. Regardless of who may apply, Mr. Washburn was obligated to complete the construction under the contract. He was also prevented from performing the repairs without a permit. A contractor cannot work on a building project without a current valid registration, R.I.G.L. § 5-65-3 (a), and no permit would be issued to someone who has no registration, R.I.G.L. § 5-65-3 (c), as the contractor's registration number must be listed on the permit. He was uniquely situated to obtain the permit — indeed, the Defendant could not obtain a permit without him.
While Mr. Washburn failed to establish that the Defendant was required to procure building permits for his work, the statutes impose significant mandates on him as the contractor. Specifically, Mr. Washburn was prohibited from doing any work without a permit:
 R.I.G.L. § 23-27.3-113.1. When permit is required — It shall be unlawful to construct, enlarge, alter, remove or demolish a building, or change the occupancy of the building from one use group as defined in this code to another; or to install any equipment for which provision is made or the installation of which is regulated by this code, without first filing an application with a building official in writing and obtaining the required permit therefor; except that ordinary repairs as defined in § 23-27.3-102.0 which do not involve any violation of this code shall be exempt from this provision.
The lease provides that Mr. Washburn will remodel the leasehold, in lieu of any payment of rent. While the remodeling must be satisfactory to all parties, the onus fell on *Page 9 
Mr. Washburn, the tenant, to complete the project. Mr. Washburn did not complete the task. He did not establish that the Defendant was obligated to obtain permits for him, nor did he establish that it improperly impeded his work. Mr. Washburn had the obligation to procure a building permit. He did not. Mr. Washburn breached the contract and failed to show that the Trombinos materially breached.
Mr. Washburn's Posttrial Mem. at 4 urges the Court to focus on "the behavior of the parties once the need for permits . . . became clear," rather than the lack of the permits. Again, he references the failure of the Trombinos to obtain the permits. This misses the mark: Mr. Washburn breached the contract by performing the work without a permit and by not completing the renovation. In his path he left the Trombinos with a significantly altered building ? altered because of his unpermitted changes. It is unclear if the Trombinos may even use the building now. To claim that the Trombinos failed to remedy the situation by allowing him to install a fire alarm without a permit skews reality. The Trombinos were attempting to prevent a bad situation from becoming much worse.
2. Mr. Washburn Failed to Justify An Award of Quantum Meruitor Equitable Estoppel.
Mr. Washburn referenced the theories of Quantum Meruit and Equitable Estoppel in his posttrial memorandum to substantiate his request for relief.
As the relationship between the parties is defined by a written contract, an action for quantum meruit is not appropriate.Marshall Contractors, Inc. v. Brown University,692 A.2d 665, 669, (R.I. 1997), n. 3. In New England RetailProperties, Inc. v. Commerce Park Associates 11, LLC.,824 A.2d 504, 505 (R.I. 2003), a realtor sued for *Page 10 
unjust enrichment and quantum meruit. Recovery was not allowed as the realtor seeking the commission payment had never required a license. The high court reasoned that allowing recovery would thwart the legislative purpose of registering. See alsoBrochu v. Santis, 939 A.2d 449, 453-454 (R.I. 2008).
Mr. Washburn has not established that the Trombinos benefited from his work. As indicated, he left the building in disarray with half-completed, unpermitted construction work. The Defendant was impaired in its ability to use the building since Mr. Washburn departed. Even Mr. Washburn's own expert, Mr. Caswell, reported that it would take three to six months to complete the construction.
 To recover on an action in quantum meruit, it must be shown that the owner derived some benefit from the services and would be unjustly enriched without making compensation therefore. National Chain Co. v. Campbell, 487 A.2d 132, 135 (R.I. 1985) (citation omitted).
Certainly, Mr. Washburn failed to establish that the Trombinos received any benefit from his work, nor would they be unjustly enriched. Accordingly, his claims of quantum meruit and equitable estoppel fail.
3. Mr. Washburn has not Established Fraud and is Not Entitledto Attorney's Fees.
In his Posttrial Mem. at 9, Mr. Washburn continues to press[3]
his claims for fraud and a statutory award of attorney's fees. Our high court again provides guidance:
 To establish a prima facie fraud claim, "the plaintiff must prove that the defendant made a false representation intending thereby to induce plaintiff to rely thereon and that the plaintiff justifiably relied thereon to his or her damage." Bitting v. Gray, 897 A.2d 25, 34 (R.I. 2006) (quoting Bogosian v. Bederman, 823 A.2d 1117, 1120 (R.I. 2003)) *Page 11 
(internal quotation marks omitted). Therefore, in this case, for the plaintiffs to establish a prima facie fraud claim, they needed to prove, among other facts, that at the time defendants entered into the agreements the defendants falsely represented that they wished to purchase the properties.
 Parker v. Byrne, 996 A.2d 627, 634 (R.I. 2010), emphasis in original.
This Court finds no evidence of an intentional misrepresentation of any material fact by the Trombinos. Indeed, it can find no false statement by the Trombinos at all. Certainly, no intent to deceive was established or is inferred.
Mr. Washburn's request for attorney's fees pursuant to R.I.G.L. § 9-1-45 requires that he prevail and establish "a complete absence of a justiciable issue of either law or fact." He has not met this high burden. His claim of fraud and his request for attorney's fees therefore fail.
4. The Defendant's Counterclaim Allows for LimitedRecovery.
The one count Counterclaim recites a variety of allegations, including that the work was not completed to the satisfaction of the Defendant, and have left the premises unrentable. While the premises may be uninhabitable, this count is not briefed in the posttrial memorandum. Throughout most of the trial, and in their briefing, the Trombinos focus on repelling the requests of Mr. Washburn for recovery. Even Mr. Lenihan's report seems to center on the alleged failures of Mr. Caswell's report.
Nevertheless, the failure of Mr. Washburn to perform the completed renovations constituted a breach of the lease on his part. As the Trombinos also failed to seek injunctive relief, and fail to substantiate their damages with sufficient certainty, the Court awards Trombino's Folly, LLC nominal damages of $100. The Court now declares the *Page 12 
original lease agreement null and void as Mr. Washburn is no longer performing, and the Trombinos are left in uncertainty as to how to manage the property now.
5. Defendant's Motion for Attorney's Fees.
Trombino's Folly, LLC has requested attorney's fees for Mr. Washburn's alleged discovery abuses. Apparently, the Defendant requested documentation of wages paid and materials purchased by Mr. Washburn for the project, and the documentation was never produced. When Mr. Washburn attempted to introduce the material at trial, defense counsel objected. When it was noted that the documentation was for subcontractors rather than employees, Mr. Washburn asked to withdraw some of these exhibits.
There was no question that the Trombinos were pressing for this material. Motions to Compel and to Default were granted in 2008. Motions to Exclude any new materials were filed in 2008 and 2010. The delay and surprise resulted in a great deal of exasperation and wasted time (during discovery and at trial) for defense counsel. Such abuses may justify an award of fees. See Manning v.Bellafiore, 2005 WL 2981660, R.I. Superior Court, November 4, 2005. Defense counsel should document his entitlement to a fee award and specify how his fees should be calculated. Plaintiff's attorney shall have ten days from the date of that documentation to request a hearing or otherwise respond. Therefore, the Court reserves on this issue until the matter is sufficiently addressed by the parties. *Page 13 
 D. Conclusion
For the reasons stated, judgment shall enter for Defendant and against Mr. Washburn, on each of the counts in the Complaint. Judgment shall enter for Trombino's Folly, LLC and against Mr. Washburn on the Counterclaim. Mr. Washburn shall pay nominal damages of $100 to Trombino's Folly, LLC, plus interest and costs. The lease agreement is now declared null and void. As the Court has reserved on the issue of attorney's fees, Final Judgment shall not enter until resolution of that issue.
[1] For example, while he indicated on direct that he had received a Masters Degree in Business Administration, on cross-examination it was indicated that he never completed his Masters Degree, and he was unsure what year he received his undergraduate degree. While he had led the Court to believe that he had a substantial construction firm of thirty to forty employees, he later revealed that he was confused at his deposition and only had limited licenses.
[2] His testimony at Court differed significantly from his testimony at the deposition. He denied having an electrician's license at trial, though he testified he had one at the deposition. (Dep., p. 7).
[3] As the mechanics lien count was dismissed on February 4, 2008 no other claims of Mr. Washburn are addressed.
 *Page 1